# STRAFFORD,

## JULY TERM, A. D. 1844.

## GREAT FALLS COMPANY *vs.* WORSTER.

Where the defendant, in an action of trespass *quare clausum fregit*, pleads or insists upon a right, title or interest in the close in question, the general replication *de injuria* is bad ; but if the title alleged is to something else, and is only stated as inducement to an excuse for entering, the general replication is proper and sufficient.

Where, to an action of trespass for entering the plaintiffs' close and tearing down a dam there erected, the defendant pleaded that the dam caused an injury to the land of third persons, and that he entered as their servant, for the purpose of abating it, the plea insists upon · no right, title or interest, within the meaning of this rule, but sets up the title in the other lands as matter of excuse for making an entry upon the land of the plaintiff. The title of the persons under whom the defendant entered is set forth as matter of inducement, to excuse or justify the entry, and the replication *de injuria* is sufficient.

If to such action of trespass the defendant plead that he was possessed of an undivided moiety of certain land which was flowed by the plaintiffs' dam, and that therefore he entered and took it down ; a replication that the plaintiffs were seized of the whole tract in fee and in mortgage, and had the right of possession, and therefore, by means of the dam, caused the water to overflow it, is insufficient.

If the replication had alleged that the plaintiffs had before that time entered into possession as mortgagees, *quære ?*

A mortgagee not in possession is not entitled to be treated as owner, except in a suit, or some other proceeding, to enforce his rights as mortgagee.

In a plea of justification or excuse for an entry to abate a nuisance, caused by the flowing of certain land by the plaintiffs' dam, it is sufficient if the defendant allege that he was possessed of an undivided moiety of such land, without stating more particularly what title he had. The possession thus alleged must be taken to be a lawful possession, and *it seems* he would have the right to abate, although his possession was only for a term.

The statute of 1832, giving this court jurisdiction in equity, has not extinguished the common law right of the party injured to enter and abate a nuisance without the institution of legal process.

The declarations of deceased persons, who from their situation appear to have had the means of knowledge respecting boundaries, and who had no interest to misrepresent the facts, are admissible in evidence.

One whose land is flowed unlawfully has an election of remedies. He may bring his action for damages, or he may abate the nuisance without suit. If he take the latter course he must proceed in a reasonable manner. The ordinary pleas to an action of trespass, founded on the exercise of such alleged right, set forth in substance that the defendant, or those under whom he acted, had the right to protect their possessions, and that the acts were done necessarily in the exercise of the right, or with as little damage as possible. But the party exercising the right to abate the nuisance is not bound to do it in the manner most convenient for the other party.

Where one abuses an authority or license which the law gives him, by which he becomes a trespasser *ab initio*, if the defendant plead the license or authority, the plaintiff should reply the matter showing the abuse. If the plaintiff reply *de injuria* generally, no question of excess is put in issue.

Where an owner of land flowed by a dam said to another person, that he gave him " all the power that he might lawfully have to draw the water raised by said dam off from his land," the court cannot say that this does not constitute such person his servant or agent to abate the nuisance. It might be submitted as a question for the jury, on the whole evidence, whether or not such authority was in fact given, depending upon the intent of the party making the declaration. Such a right is not assignable.

Where a defendant, in an action of trespass for cutting down a dam, alleged in his plea that he was possessed of an undivided moiety of a certain tract of land, flowed by means of the dam, and the plaintiffs replied that they were seized in fee and in mortgage, and had the right of possession, and issue was taken upon the rejoinder that they had not the right of possession, it was *held*, that the issue was immaterial, and a repleader was awarded.

An entry by a mortgagee to survey the mortgaged premises, merely for the purpose of obtaining information respecting the boundaries, or to exercise a power not warranted by the mortgage, as to flow the land by means of a dam erected on other land belonging to the mortgagee, cannot be regarded as a possession under the mortgage, because it does not appear to have been made in the exercise of the rights of the mortgagee.

Neglect for more than twenty years to assert a title to an undivided interest in lands, by one who had a valid title, does not operate as an abandonment, there being no adverse possession.

One tenant in common cannot, as against his co-tenants, convey a part of the common property in severalty by metes and bounds, nor even an undivided share of such part.

One tenant in common is not bound to assert his title by objecting to an unlawful conveyance by his co-tenant.

Notice of a conveyance by one tenant in common of a part of the lands in seve-

ralty, will not prevent a party from purchasing the share of the other co-tenant in the whole of the estate held in common, in the same manner as if the conveyance had never been made. Mere notice of an invalid conveyance cannot make it good.

The grantee in a deed poll is not estopped to deny that the grantor had such an estate as he undertook to convey.

Nor does the taking of a deed of land which sets forth as its boundary on one side "the land of A," estop the grantee from denying the title of A to such adjoining land.

Nor does the fact that one holds an assignment of a mortgage estop him from denying the title of the mortgagor to the premises, he not relying upon such mortgage title.

Nor does the fact that one has contracted with the widow and executrix of a party who has made some conveyance of lands, (upon a consideration personal to herself,) to save the estate and heirs of her husband harmless from all damage on account of his not being the owner of the estate conveyed by him, estop the party contracting to indemnify, from denying the title of the grantee of the husband.

The deed of a tenant in common, conveying by metes and bounds a part of the estate held in common, can neither be extended so as to include, as against his co-tenants, any undivided interest in the whole estate, nor can it be held good as to his co-tenants for any portion of the land embraced in it, without a partition.

But if the grantor with warranty in such deed, or his heirs, should retain a legal interest in the estate as a tenant in common, and, (his deed in severalty having been avoided by the other co-tenants as being inoperative against them,) a partition should be made, by which a portion of the land embraced in such deed should fall to such grantor's share, the grantee in severalty might enter and hold by force of the warranty, and claim the title acquired by the grantor upon the partition by force of the estoppel, not only against the grantor himself, and his heirs, but against purchasers under him with notice.

In an action of trespass *quare clausum fregit*, if the defendant excuse the entry, by alleging that he entered to remove a dam which flowed land of which he was lawfully in possession, the plaintiff cannot, in avoidance of the defence, set up a title to the land flowed, which was acquired by him subsequently to the removal of the dam.

A deed by one tenant in common, conveying a certain number of acres in common in a tract, which in fact is less than his whole share, is not void for uncertainty. The whole number of acres in the tract being ascertained, it will operate to convey a proportionate share.

As between tenants in common there is no necessity for recording conveyances of the common estate, unless the grants impinge.

Where one holds, and is in possession of certain rights in a tract of land by a deed which is recorded, and has certain other rights by a deed which is not re-

corded, his possession will not be notice of a title or claim beyond what he holds under the deed which is recorded.

A, a tenant in common, made a conveyance in severalty, by metes and bounds, of a part of the tract to B, which conveyance was invalid against the other tenants in common, being made without their consent, but good against the grantor, his heirs and assigns, being duly recorded. Upon the death of A, his heirs conveyed the lot to C, who subsequently purchased the shares of the other tenants in common.—*Held*, that C could not, by virtue of the conveyance from the other tenants in common, avoid the title of B upon the ground that it was a conveyance in severalty, and then claim under the deed from the heirs of A, against B, what he could not otherwise have claimed against him by virtue of that deed. The deed from the other tenants in common cannot convey more than their share, nor can the rights of C, as against B, be enlarged by his purchase from them. C. cannot, by virtue of the different conveyances to him, take the whole land, when his grantors collectively could not have done so, nor treat the deed from one of his grantors as void and valid at the same time.

Where it should be necessary, in order to prevent the several deeds of different grantors to a single grantee from operating to a greater extent than the several grantors could have claimed title, the court might, perhaps, regard the grantee as holding in trust for those whose rights would otherwise be extinguished, or injured, by allowing such greater claim.

A, being tenant in common, conveyed to B, by one deed, a part of the land in severalty, and by another deed a certain number of acres of the land in common and undivided, which deed was not recorded. B. was present afterwards when the heirs of A, with C, were surveying the lot, spoke of the land he occupied in severalty as his, refused to sell it, &c., and made no mention of his farther claim under the other deed. But he was not present when any conveyance was made by the heirs.—*Held*, that he could not be estopped by this transaction from setting up his title under the second deed, if otherwise valid.

One tenant in common has no right, by means of a dam erected on other land of which he is sole seized, to flow the land owned in common, without the consent of his co-tenants. It is a wrong to his co-tenants, of the same character, and which allows of similar remedies, as if they had been sole seized.

Where one alleges a particular title as the ground of excuse or justification for an act which would otherwise be a trespass, he is bound to prove the title precisely as he has alleged it.

TRESPASS, *quare clausum fregit.* The declaration contained four counts. The first charged that the defendant, April 1, 1837, broke and entered the plaintiffs' close, situated in Milton, (describing it,) and then and there tore down, carried away, and destroyed the plaintiffs' dam there standing. The second count charged an entry into the same close, April 29, 1837, and the destruction, &c. of the plaintiffs' dam; and farther, that by rea-

son thereof the water of the plaintiffs' mill pond ran to waste, and that thereby the use of the same for driving the plaintiffs' mills, &c., situated below, was lost. The third count charged a similar entry, May 13, 1837, and the destruction of the plaintiffs' dam, and a consequent similar waste and loss of water. The fourth count charged that the defendant, May 11, 1837, cut down, carried away, and destroyed the plaintiffs' dam, and took and carried away the materials thereof, and disposed of the same to his own use, and also charged a consequent similar waste and loss of water. The several counts charged the acts named as done at divers other times, from the dates named to the date of the writ, which was May 16, 1837.

The defendant filed twenty-one pleas ; the first seven were to the first two counts, the next seven were to the third count, the last seven were to the fourth count.

The first, eighth and fifteenth pleas, which were severally to the first and second and the third and the fourth counts, set forth that as to destroying a part of the dam, fifty feet in length and two feet in height at one end, and six feet in height at the other end, the plaintiffs ought not to have an action against him, because at the time of the alleged trespasses the defendant was possessed of an undivided moiety of a certain tract of land in Milton, containing thirteen acres, and being part of the fourth division, lot 120, said land bordering on the river, which tract, in violation of ancient usage, the plaintiffs flowed by means of the said part of said dam, which part of said dam the defendant, having entered upon the plaintiffs' close, did tear down and carry away to a small distance, and left the same on the plaintiffs' close, and justified the taking down, &c., of the same. To the first plea the plaintiffs replied de injuria, on which issue was joined. To the eighth plea the plaintiffs replied,(protesting that the defendant was not possessed of the said undivided moiety, as alleged by him,) that the plaintiffs were seized of the whole of said tract of land in fee and in mortgage, and had the right of possession thereof. To this replication the defendant demurred, which was joined. To the fifteenth plea the replication was, that the plaintiffs were seized in fee and in mortgage, and had the right of possession of the

whole of said tract, and was actually possessed of the same, and traversed the defendant's possession of an undivided moiety of the same. Upon this replication issue was joined.

The second, ninth and sixteenth pleas, which were severally to the different counts as aforsaid, set forth that one Joseph Fernald was, at the time of the said alleged trespasses, seized and in possession of a certain thirty acre lot of land in Milton, being part of the fourth division, lot 120, and bordering on the river, which lot the plaintiffs, by means of the same part of the dam above mentioned, flowed, which part of said dam the defendant, as the servant of the said Fernald, entered to remove, &c. and justified the same. To the second plea the plaintiffs replied *de injuria*, to which the defendant demurred specially, because the replication does not traverse any allegation in the defendant's plea except by the general traverse, *de injuria*, which is insufficient, inasmuch as the plea alleges a title and right in Fernald, as whose servant the defendant entered, &c. To the ninth plea the plaintiffs replied by a traverse of said Fernald's seizin, whereupon issue was joined. To the sixteenth plea there was the same replication and issue.

The third, tenth and seventeenth pleas, set forth that, at the time of the alleged trespasses, one James Fernald was seized of an undivided part of a three-hundred acre lot in Milton, called the Denbow lot, equal to twenty-five acres in common and undivided in said lot, except said undivided part of the thirty acres in said lot conveyed to Joseph Fernald, (as above stated,) which lot borders upon the river, and which the plaintiffs, by means of said part of said dam, in violation of ancient usage, flowed, and which part of said dam the defendant, as the servant of said James Fernald, entered to remove, &c. and justified the same. To the third plea the plaintiffs replied *de injuria*, on which issue was joined. To the tenth plea the plaintiffs replied by a traverse of said James Fernald's seizin, whereupon issue was joined. To the seventeenth plea there was the same replication and issue.

The fourth, twelfth and nineteenth pleas, set forth that at the time of the alleged trespasses one Isaac Worster was seized of a tract of land in Milton, on the " Plains," containing six acres

and twenty-four rods, bounded as follows: Beginning at a white birch, formerly standing near the pond, at the landing place, so called; thence running north, fifty-four degrees east, sixty-one and a half rods; thence north, forty-five degrees west, sixteen rods; thence south, fifty-four degrees west, sixty-one and a half rods; thence to the first mentioned bound; which lot the plaintiffs, by means of said part of said dam, in violation of ancient usuage, flowed, and which part of said dam the defendant, as the servant of said Worster, entered to remove, &c. and justified the same.  To the fourth plea the plaintiffs replied *de injuria,* on which issue was joined.  To the twelfth plea the replication, protesting that Worster was not ·so seized, alleged that it was not necessary to tear down so much of the dam in order to prevent the overflowing of said tract, upon which allegation issue was joined.  To the nineteenth plea, the replication alleged that the defendant did not cause the water to overflow said tract, upon which allegation issue was joined.

The fifth, eleventh and eighteenth pleas set forth that, at the time of the alleged trespasses, said Worster was seized of an undivided fourth part of a certain tract of land in Milton, bounded on the river, with the right of extending a dam across the river, and of a mill privilege for a trip-hammer and corn mill, and of an undivided fourth part of a corn mill, and mill dam, to raise a head of water upon the river as high as should be necessary for said mill, and was in actual possession of the same, with the right of having the whole water of said river without other obstruction than existed before the erection of a part of the plaintiffs' dam; but the plaintiffs, April 1, 1836, erected the said part of said dam, (as before described,) and extended the same to the same height across the river above said Worster's dam, and so stopped the flow of the water, &c., &c., in violation of ancient usage, and which part of said dam the defendant, as the servant of said Worster, entered to remove, &c. and justified the same.  To the fifth plea the plaintiffs replied *de injuria;* to which the defendant demurred specially, because the replication does not traverse any allegation of the plea, except by the general traverse *de injuria,* which is insufficient, inasmuch as the plea alleges a title and right

in Worster, as whose servant the defendant entered, &c.  To the eleventh plea, the plaintiffs replied seizin and possession of a privilege on the river above said Worster's mill, in the advantageous use of which the company did a little obstruct the flow of the river, but not so as alleged in said plea, to prevent the use of said Worster's mill; on which allegation issue was joined.  To the eighteenth plea there was a replication, denying the stopping of the water, and issue upon a rejoinder that the plaintiff did stop the water.

The sixth, thirteenth and twentieth pleas, set forth that, as to destroying said part of said dam, the defendant was, at the time of the alleged trespasses, possessed of a moiety of two undivided fifth parts of a certain thirteen acre tract of land in Milton, being part of the fourth division of lot 120, said land bordering on the river; which tract the plaintiffs, in violation of ancient usage, flowed by means of said part of said dam, and which part of said dam, the defendant having entered, &c. did tear down, &c. and justified the same.  To the sixth plea the plaintiffs replied *de injuria*, on which issue was joined.  To the thirteenth plea, the plaintiffs replied (protesting the defendant was not so possessed,) that the plaintiffs were seized of the whole of said tract in fee and in mortgage, and had the right to the possession thereof.  The defendant rejoined, that the plaintiffs were not so seized of the whole of said tract, whereupon issue was joined.  To the twentieth plea, the replication alleged that the plaintiffs had a mortgage of the whole of said tract, and had a right of possession, and had actual possession, and traversed the defendant's possession.  The rejoinder alleged the defendant's possession, whereupon issue was joined.

The seventh, fourteenth and twenty-first pleas, set forth that, at the time of the alleged trespasses, one Joseph Fernald was seized of one undivided quarter part of a thirty acre lot in Milton, being part of the fourth division, lot 120, and bordering on said river; which lot, in violation of ancient usage, the plaintiffs, by means of said part of said dam, flowed, which part of said dam the defendant, as the servant of Joseph Fernald, entered

to remove, &c. and justified the same. To the seventh plea the plaintiffs replied *de injuria ;* on which issue was joined. To the fourteenth and twenty-first pleas, the plaintiffs replied that Joseph Fernald was not so seized, and on both replications issue was joined.

The plaintiffs proved that the defendant, April 29, 1837, took up some of the planks of the dam in question; May 9, 1837, he cut away a part of the wing dam, which was immediately rebuilt, and on May 13 again cut away by the defendant. When the defendant removed the planks, the pressure of the current carried away the wing dam.

On the eleventh and eighteenth pleas a verdict was rendered, by consent, for the plaintiffs.

The issues joined on the fourth, twelfth and nineteenth pleas, relating to the "Plains," or Worster lot, were found for the plaintiffs.

The defendant proved that Isaac Worster had been in possession of the "Plains lot" from May 1, 1821, when the same was conveyed to him by Thomas Leighton and Ruth H. Jones, and that on April 29, 1837, before the entry, &c. said Isaac "gave him all the power the said Isaac lawfully might have to draw the water raised by said dam off from his land."

The defendant also proved that a portion of said land, which lay near the plaintiffs' mill-pond, was flowed, unless a strip of land between the Plains lot and the pond was not embraced in the last named conveyance. This question depended on the location of the white birch which formed the southeasterly corner of the lot. If this was where the plaintiffs claimed, the lot was not flowed by the plaintiffs' dam.

Among other witnesses to this point, the plaintiffs called Theodore C. Lyman, who testified that on one occasion in 1838, when he was on said lot, James Roberts, the adjoining proprietor, then over sixty years old, and who died previous to the trial, pointed out a stump, on the line between his land and Worster's, and said it was Worster's corner. To the admission of this evidence the defendant excepted. The jury, in answer to questions proposed by the court in writing, found on this point that " the birch

stump contended for by the plaintiffs is the true southeasterly corner of the Worster lot." There never was any dispute between Roberts and Worster about the boundary.

In relation to the issue joined on the fourth plea, the plaintiffs proved that the dam consisted of a main part, extending across the stream and the wing dam taken away by the defendant, which extended up the stream nearly on a right angle with the main dam; that this wing was supposed to be permanently secured, and could not, under the usual pressure of water, be removed without cutting; that six feet in height of the main dam was constructed by setting up several posts along the top of an old dam, in the sides of which posts were grooves, into which loose planks, fitted for that purpose, were dropped between each two posts; there was also a platform supported by the tops of these same posts, which extended the whole length of the dam, and served as a passage way across the river. In the tops of the planks were rings, in order that they might be the more readily raised, so as to reduce the water to any point desired. The defendant proved that he at first attempted to clear his land from the water, by removing these planks, but that they were immediately replaced by the plaintiffs before the water was reduced more than one foot. The court charged the jury that if there were loose planks in the dam, which the defendant might have taken away with less injury to the plaintiffs, and which would have relieved his land from water in a reasonable time, he was not justified in removing the wing.

It was admitted that the dam which the defendant cut away was six feet higher than the former dam, and that it caused the water to overflow the Denbow lot.

The plans of the premises, put into the case by consent, showed a frog-pond at some little distance from the mill-pond. Between these there was no connection, unless it were beneath the surface of the ground. The defendant proposed to show that on former occasions he had caused observations to be made, from which it appeared that the water had risen and fallen in the frog-pond, without any other observable cause than its supposed connection with the main pond. The court, however, instructed the jury

that, no matter how it had been proved to be on former occasions, unless the defendant proved that, at the time he cut away the dam, the frog-pond was thus flowed by the dam, he could not justify himself in that part of his defence. To these instructions the defendant excepted.

Upon certain of the issues, made on the pleadings, as above stated, the defendant offered evidence of his title to parts of the land flowed, called the "Fernald lot," and the "Fall lot."

In relation to the "Fernald lot," it appeared that in 1795 Samuel Palmer, Beard Plumer and Joseph Plumer, senior, owned and occupied the Denbow lot, as tenants in common; Palmer owning one half and the Plumers each one quarter.

January 11, 1802, S. Palmer conveyed to I. Hovey one half of the Denbow lot. January 28, 1807, S. Palmer conveyed to I. Hovey the same quarter part of the estate, that day conveyed by Hovey to Palmer, to indemnify him against any loss arising from any claim of dower by Palmer's wife to certain lands conveyed by Palmer to Hovey. February 3, 1814, Hovey conveyed to Thomas Leighton all the land he then owned in Milton, including his part of the grist-mill, to which he was entitled by virtue of Palmer's deed, excepting such parts as he had before conveyed to Palmer and others. March 28, 1815, Leighton conveyed three eighths of the Denbow lot to Joseph Plumer, junior. September 10, 1816, Plumer conveyed to Beard Plumer, senior, three sixteenths of the Denbow lot. May 17, 1819, Joseph Plumer conveyed to Joseph Plumer, junior, one quarter of the Denbow lot. After these conveyances, Joseph Plumer, junior, and Beard Plumer, senior, owned seven eighths of the Denbow lot.

Beard Plumer, senior, by his will dated October 5, 1816, devised two sixteenths of the Denbow lot to Joseph Plumer, junior, and three sixteenths to John Plumer. He also devised to John Plumer the use and occupancy of all his real and personal estate, (a part of which was his remaining interest in the Denbow lot,) except what was before devised, he paying one half the debts and legacies, and, if he died without issue, then said property to

go to Joseph Plumer, junior, and Beard Plumer, junior, in equal shares.

Beard Plumer, junior, died without issue twenty days before John; John also died without issue; both of them outlived the testator.

The heirs at law of Beard Plumer, junior, and also of John Plumer, were Joseph Plumer, junior, Enoch Plumer, Betsy Hall, S. Brown, and Mary H. Plumer, daughter of Jonathan Plumer, deceased. Joseph purchased all their shares except that of Mary. His title to Enoch's share was through his widow and devisee, Frances Plumer.

Enoch's will was made in Fayette county, Pennsylvania, purporting to be duly approved by the probate court of that county, a copy of which was filed in the court of probate for this county.

The defendant produced as evidence of said will a copy of said copy, to which the plaintiffs objected as incompetent, but the objection was not subsequently relied on in the argument of the case.

February 13, 1819, Joseph Plumer, junior, conveyed to James Fernald twenty-five acres in common in the Denbow lot, by deed, with warranty. This deed was not recorded till May 30, 1837. September 20, 1821, he also conveyed to said Fernald thirty acres of said lot by metes and bounds, and with warranty. This deed was recorded May 1, 1826. December 21, 1831, James Fernald conveyed said thirty acres to Joseph Fernald, who, on the 21st of November, 1836, gave the defendant a power of attorney to enter upon the premises, remove all dams and water, &c., &c.

The defendant also proved that in the fall or winter, after the dam was built and before it was taken away, James Fernald told the defendant that he gave him full authority to clear his land from water. The defendant then had a power of attorney from Joseph Fernald, which related to the thirty acre piece. Nothing was said at the time about any other land, nor that any confirmation was necessary from Joseph.

The share of Mary H. Plumer, who is of full age, was con-

veyed by her to J. G. Hall, February 16, 1833, who conveyed it to Reuben Hannaford in fee and in mortgage, April 21, 1837. Hall and Hannaford conveyed to Sally Plumer, widow and executrix of Joseph Plumer, junior, on the 27th of April, 1837, all their interest in the Denbow lot. Joseph Plumer, junior, left sufficient property to pay his debts. His will was proved January 26, 1826.

The defendant's right to the "Fall lot" depends upon a conveyance from Joseph Plumer, junior, in 1821; previous to which time the same evidence of title which applies to the "Fernald lot" applies to this also. March 28, 1821, Plumer conveyed to Benjamin Miller one hundred and fifty acres in the Denbow lot, including the "Fall lot," which contained about thirteen acres. May 25, 1825, Miller conveyed to Moses Paul a tract by metes and bounds, including the "Fall lot." February 20, 1832, Paul conveyed the "Fall lot" to I. & J. Cowell; February 22, 1832, they conveyed it to John Fall, who in turn conveyed it, November 19, 1836, to the defendant. November 23, 1836, the defendant notified the plaintiffs' agent to lower the dam, and January 2, 1837, he gave the plaintiffs the same notice.

The defendant offered the deposition of Sally Plumer, (widow of Joseph Plumer, junior,) to show a contract between herself and the plaintiffs, and produced an agreement in writing, signed by the plaintiffs' agent, dated May 10, 1837, by which the plaintiffs covenanted to indemnify her husband's estate and heirs from all cost and damage arising from any breach of covenant by such defects in the title of Joseph Plumer as are caused by his not being the lawful owner of the interest or right in land conveyed by her to the plaintiffs, as appears below. This contract having been admitted in evidence, the plaintiffs, objecting thereto, offered a deed from the said Sally Plumer to them, dated May 10, 1837, and recorded the next day, conveying all her right in the Denbow lot; also a deed from Thomas Leighton to them, of the same date and record, conveying all his interest in the same lot.

November 8, 1836, I. & J. Cowell conveyed to the plaintiffs one hundred and fifty acres in the Denbow lot, excepting what had been conveyed to Fall. They also released to the plaintiffs

by the same deed all damages for flowage, and covenanted to convey to them at a certain rate all such lands in Milton as would be flowed by reason of the height of the dam at the outlet of the ponds.

September 20, 1821, Joseph Plumer, junior, conveyed to S. Cowell thirty acres in the Denbow lot, by metes and bounds. September 13, 1828, S. Cowell conveyed the same to James Cowell. August 24, 1829, James conveyed to Amy Cowell the same land, calling it forty-one acres, in the Denbow lot. November 8, 1836, Amy and Edmund Cowell conveyed the same to the plaintiff. In the last four deeds the land conveyed is described as bounded on one side by land of James Fernald, which land is the thirty acre lot.

March 25, 1822, Joseph Plumer, junior, conveyed to Daniel Hanson forty acres in the Denbow lot by metes and bounds. February 19, 1836, said Daniel conveyed one half of the same to Joseph Hanson, who conveyed the same to the plaintiff, November 8, 1836. In the first two deeds the land is described as bounded by land of James Fernald, meaning said thirty acre lot. April 21, 1834, Daniel Hanson conveyed to one Lord one half of his land in the Denbow lot, and Lord conveyed the same to the plaintiff, November 8, 1836.

March 28, 1821, Joseph Plumer, junior, conveyed to John Farnum fifteen acres in the Denbow lot by metes and bounds. November 8, 1836, Farnum conveyed the same to the plaintiff.

All the above deeds of the Denbow lot to the plaintiff were recorded before January 1, 1837.

February 24, 1837, the three children of Joseph Plumer, junior, conveyed to the plaintiff all the land in the Denbow lot flowed by the dam at its then height, and covenanted to convey such other lands as the plaintiff might wish to flow, and conveyed the right of flowing thirty-six acres and ninety square rods of said lot. This, with the several other deeds to the plaintiff, before mentioned, covered all the land that has been flowed in the Denbow lot, except the thirty acre and the "Fall lot." This deed was recorded March 6, 1837.

November 19, 1836, the defendant conveyed to John Fall the

"Fall lot" in mortgage, to secure $325, in nine months, with interest, and Fall assigned the note and mortgage to the plaintiff. The debt secured thereby was paid August 10, 1837, to the plaintiff's agent by an agent of the defendant.

The superstructure of the dam, to raise the water six feet higher at the outlet of the ponds in Milton, was built by the plaintiff in the fall of 1836. The land was surveyed twice after the assignment of the mortgage, once when it was free from water, and once when the water was four feet above the original dam, for the purpose of ascertaining how much land was flowed. The agent testified that he consulted counsel about taking possession under the mortgage, and was advised that enough had been done, and that it was not necessary to send an officer for that purpose; that he did not notify the defendant that he had taken possession, and could not say whether he had given directions about such possession; that the Fall note was delivered but not indorsed at the time of the assignment, but it was indorsed while in his hands; he was not sure whether it was indorsed at the time the dam was cut away; that the plaintiff has never paid any thing to the land owners on account of the dam being raised.

The plaintiff offered evidence tending to show that in 1836 Fernald was present when a committee on behalf of the plaintiff and the land-owners went upon the land to ascertain the quantity of land flowed and assess the damages. Before they reached the thirty acre lot, he came, pointed the lines of his lot, and where they should survey, and said he would not sell his land at their appraisal. He knew they were about purchasing the land, and made no claim to any other land than the thirty acres. He said he had some doubts as to the propriety of showing them his land, but said he had no objections to their surveying it, though he refused to assent to their flowing it. Leighton said his land was appraised too low; he claimed what was below high water mark, but was not understood to claim any of the Denbow lot, and did not complain that the committee had not appraised all his land. The conveyances of the land were made, with one or two exceptions, according to the estimate of the committee.

Thomas Leighton was called and admitted as a witness for the

defendant, the plaintiff objecting. He stated that he was the Thomas Leighton who conveyed three eighths of the Denbow lot to Joseph Plumer, junior, in 1814, and in 1837 conveyed the Denbow lot to the plaintiff by deed of quitclaim; that he did not remember that between 1815 and 1837 he had ever asserted any claim to any part of the Denbow lot, or that he ever went upon it claiming to own it, or was ever taxed for it, or exercised any acts of ownership over it. He also stated that he had heard James Fernald and others claim an interest in the Denbow lot, but never informed any of them that he owned or claimed to own any part of it.

*Joseph Bell,* (with whom were *James Bell* and *Hale,*) for the defendant, argued the case very fully upon all the questions raised by the pleadings, and upon the trial. His positions will be found in the opinion of the court. He cited 8 *Co.* 66, 7; 1 *B. & P.* 79, 80; *Yelv.* 157; *Cro. Jac.* 224; *Buller's N. P.* 93; 22 *Pick.* 316; 7 *Conn.* 220; 5 *Day* 483; 12 *Pick.* 463; 1 *Stark. Ev.* 303, 305; 1 *Phil. Ev.* 244, 5; *Co. Litt.* 352, (*a.*)

*Bartlett* and *Christie,* for the plaintiff. The general questions are, 1. Whether the doctrine or principle upon which the defendant's pleas are based, is to be sustained here. 2. The several exceptions to the ruling and charge of the court on the trial of the issues touching the Plains lot. 3. The three issues in law on the demurrers. 4. The rights, interests, and relations of the parties in the Fall lot. 5. The title of Joseph Fernald to and in the thirty acre lot. 6. The title of James Fernald to twenty-five acres in common, and in the Denbow lot.

1. We deny the right to enter and demolish the dam, even if it *did* wrongfully cause the water to overflow land belonging to himself, or those whose servant he was, although we are aware that it has been permitted in England and some of our States, and perhaps formerly in this State. But the legislature have since given this court such ample chancery powers to enjoin parties and abate nuisances, that private individuals should no longer be allowed to enter and abate them for themselves. To allow

Great Falls Company *v.* Worster.

such a course endangers public peace, and puts private rights in extreme jeopardy. As no necessity now exists for a resort to private redress, this court should not suffer itself to be bound by old decisions, when the same powers had not been intrusted to this court. But if the court are bound by them, they will hold the defendant to make out a clear case of strict legal right.

2. Under this head we consider, first, the testimony of Roberts. He had no interest to misrepresent, and had the means of knowledge. 1 *Phil. Ev.* 197, 198 ; 14 *East* 331. The declarations of a deceased person who surveyed the land are admissible. 6 *Binney* 59, *Caufman* vs. *Presb. Congregation*, &c. ; 1 *Peters's C. C. R.* 496. But his testimony was immaterial, and a verdict will not be set aside on account of the admission of immaterial testimony. 5 *N. H. Rep.* 91, *Page* vs. *Wheeler ;* 6 *N. H. Rep.* 342, *Hamblett* vs. *Hamblett ; Ditto* 80, *Jewett* vs. *Stevens ;* 4 *N. H. Rep.* 69, *Wiggin* vs. *Damrill ;* 9 *Pick.* 176, *Prime* vs. *Shepherd ;* 22 *Pick.* 427, *Buddington* vs. *Shearer ;* 6 *Cowen* 449, *Norris* vs. *Badger.*

Next, as to the removal of the planks. Were the instructions of the court correct ? If the defendant was injured, he had ample remedy by action, and if he assumes to take his remedy into his own hands, still the law limits his powers. If he could remove the obstruction with a view to prevent its being replaced, he might have destroyed the whole dam, or even the mills, to remove the inducement to replace the dam. As to how much he might have removed, see *Angell on Water Courses* 141 ; 6 *Bing.* 379, *Greenslade* vs. *Halliday.*

Then as to the frog pond. The instructions were clearly correct. The evidence was not material to the issue, nor was it relevant.

The case finds that Isaac Worster gave the defendant all the *power* that he had, to draw the water from his land. This did not make him Isaac's servant. Isaac gave him his *power* merely, but did not request or command him to do any thing, nor would the evidence make Isaac liable for the defendant's acts in this matter. He was a mere volunteer. The same objection is good as to the justification, based on the authority of James Fernald's lot, the authority from him being the same as from Isaac Worster.

3. Is the replication to the second and fifth pleas sufficient? We contend that it is.  1 *Chitty's Pl.* 638, 639, 641 ; *Com. Dig., Pleader, F,* 18, 19, 20, 21 ; 1 *B. & P.* 80 ; 1 *East* 212 ; 2 *Saund.* 295 ; 8 *Wend.* 129 ; 4 *Wend.* 577 ; 1 *Wend.* 126 ; *Yelv.* 157 ; *Cro. Jac.* 225 ; *Willis* 102–3 ; 4 *Bing.* 729 ; 1 *Crompton & M.* 197, *Piggott* vs. *Kemp ;* 9 *Dane's Abr. p.* 518, *art.* 7, § 7, *latter clause ;* 2 *B. & C.* 908, *O'Brien* vs. *Faxon ;* 23 *C. L. R.* 14, *Sibley* vs. *Bardous, per Parke,* C. J. ; 5 *Dane's Abr.* 613, *art.* 7, § 10 ; 5 *Cowen* 338 ; 1 *Johns.* 380 ; 10 *Johns.* 369 ; 10 *Johns.* 424 ; 1 *N. H. Rep.* 167, 169 ; 2 *N. H. Rep.* 16 ; 6 *Johns.* 290 ; 11 *Johns.* 534 ; 2 *Cruise* 81, § 16 ; 2 *Vern.* 392 ; *Sel. Cases in Chanc.* 30 ; 1 *Hill. Abr.* 283, § 382 ; 1 *Pow. on Mortg.* 248 ; 2 *Story's Eq.* 197, § 914 ; 2 *Greenl.* 132 ; the latter cases cited as to the estate of a mortgagee in possession.

4. The rights of the parties in the " Fall lot."

The assignment of the defendant's mortgage, originally given to John Fall, to the plaintiff was good, without an indorsement of the note.  6 *N. H. Rep.* 210.

There are five issues touching this lot.  The 13th raises the question whether the plaintiff had the right of possession. There was no reservation.  The mortgage was in usual form, and gave a present right of possession.  1 *N. H. Rep.* 171, *Brown* vs. *Cram ;* 16 *Mass.* 39, *Colman* vs. *Packard ;* 2 *Greenl.* 132, *Blaney* vs. *Bearce ;* 1 *Hill. Abr.* 279, § 7.

The 1st, 6th, 15th and 20th issues are whether the defendant was possessed of such parts of the lot as he alleges.  He never entered, but the plaintiff has entered *twice* since they received the assignment of the mortgage and surveyed the land ; having, too, as we say, the right of possession under the mortgage, and they had for some months used it as a reservoir for their water, having flowed it to the depth of several feet.  The fact that they consulted counsel, and acted under advice that they had taken actual possession, shows its character.

Judgment on these pleas should be in favor of the plaintiff, on the ground that they contain no sufficient answer to what they purport to answer.  *Gould Pl., ch.* 10, § 46 ; 5 *Pick.* 187,

---

*Dewey* vs. *Humphrey ;· Yelv.* 24, *note, and cases there cited ; Hob.* 56, (4) *Williams's Ed.*

5. Was Joseph Fernald seized in fee, &c. of the "30 acre meadow lot"? The course of the conveyances and title shows that before Joseph Plumer, junior, undertook to convey thirty acres by metes and bounds, to James Fernald, he was the owner in common of 247½ acres, equal to $\frac{99}{120}$ parts, and the plaintiff owned 52¼ acres, or $\frac{21}{120}$ parts of the Denbow lot. James Fernald afterwards conveyed the same thirty acres to the defendant. But this is no evidence of title in him, either to the whole or one quarter part of the thirty acre lot; not to the whole, for Plumer had only $\frac{99}{120}$ths thereof, and his deed could give no more than he himself had. Nor yet to any part of it, since a tenant in common, assuming to convey a part of the estate by metes and bounds, does not pass even his interest in that part as against his co-tenants or their grantees. 9 *Mass.* 34, *Porter* vs. *Hill ;* 12 *Mass.* 348, *Bartlet* vs. *Harlow ; Ditto* 474, *Varnum* vs. *Abbot ;* 13 *Mass.* 57, *Baldwin* vs. *Whiting ;* 24 *Pick.* 329, *Peabody* vs. *Minot ;* 1 *N. H. Rep.* 42, *French* vs. *Lund ;* 4 *Kent* 368, (3*d ed. ;*) 4 *Conn.* 510, *Mitchell* vs. *Hazen ;* 5 *Conn.* 363, *Griswold* vs. *Johnson ;* 3 *Yerger* 492, *Jewett* vs. *Stockton.*

But it·is said the plaintiffs have taken deeds of adjoining lots, described therein as bounding on this thirty acre lot, and that they are thereby estopped to deny it was his land. Neither the defendant nor Fernald are parties to any such deed. Now, every estoppel must be reciprocal. *Com. Dig., Estoppel, C,* 3 ; 2 *Johns.* 382 ; 3 *Johns. Cases* 101. The same reason and authorities will apply to the alleged estoppel by the plaintiff's agreement of May 10, 1837, with Sally Plumer, executrix of Joseph Plumer, junior. Moreover, we may waive all our titles except one or both of those from Leighton and Mary H. Plumer, neither of which were ever owned by Joseph Plumer, junior. 13 *Mass.* 57, *Baldwin* vs. *Whiting ;* 15 *Mass.* 106, *Gibson* vs. *Gibson.* And this contract with Mrs. Plumer was in her own right, she having bought Mary's right with her own funds. To the contract with her the grantees of Joseph, junior, are neither parties nor privies. She may release it whenever she pleases. The evidence of the making of this contract was *res inter alios.*

In answer to the objection that we became the owners of the Leighton and Mary Plumer rights after some of the trespasses were committed, we say that the deed of a tenant in common to a stranger, of a part of the common property, is *void from the beginning as against a co-tenant and his assigns.*

6. Was James Fernald seized, &c. of twenty-five acres in common and undivided in the Denbow lot, except, &c.

Joseph Plumer, junior's, deed to James Fernald, dated February 13, 1819, recorded May 30, 1837, describes the premises conveyed as follows : " a certain tract or parcel of land, situate in said Milton, containing twenty-five acres, in lot numbered 120, drawn to the original right of Salathiel Denbow, being in common and undivided with land in the same lot owned by James Plumer, &c. and others."

1st. We say this deed is void for uncertainty.

2d. We object its want of record until after the plaintiff had acquired, as we say, the whole of the Denbow lot, from the four following sources, viz : 1. From Samuel Palmer through Hovey and Leighton. 2. From Beard Plumer, through Mary H. Plumer and her grantees. 4. From Joseph Plumer, junior, through his grantees. Now every grant from Joseph Plumer, jr. of parts of the Denbow lot by metes and bounds, since the execution of this deed of 1819, impinges and interferes with that grant to James Fernald, if it was, as the defendant contends, a grant of a common and undivided interest in said lot. But, it is said Joseph, junior's, interest is not as yet *exhausted,* and that until his interest was exhausted his grants could not impinge, and that of course record was not necessary. Both of these positions we deny. Between February 13, 1819, and May 20, 1837, he made the following conveyances :

To Benjamin Miller, March 28, 1821, 150 acres ;
" John Farnham, " " " 15 "
" James Fernald, September 20, 1821, 30 "
" Samuel Cowell, " " " 30 "
" Daniel Hanson, March 25, 1822, 40 "

Making in all, 265 acres.

More than 220 of the 265 acres had, long before the recording of said deed, or any of the trespasses, been duly conveyed to the plaintiff, and the deeds of the same being recorded before that to James Fernald, must take precedence.

We have already shown that Joseph Plumer, junior, owned only 247½ acres in the Denbow lot, and he has sold 265 acres exclusive of this 25 acres in common, &c. sold to James Fernald !

By deed of February 24, 1837, recorded March 6, 1837, the heirs of Joseph, junior, conveyed all of the Denbow lot flowed by the dam at its then height, to the plaintiff. The case finds that the whole of the Denbow lot was flowed by the dam, so that this deed conveys to us the whole of that lot. This deed from Joseph's heirs must take precedence also of that to James Fernald, being first recorded. There was nothing inconsistent in the plaintiffs' buying in the titles of most of Joseph Plumer, junior's, grantees ; they might well do it to quiet their title without interfering with any other claim ; they may claim under his grantees as against *James* Fernald's seizin of 25 acres in common, &c., and as against *Joseph* Fernald's seizin of the thirty acre lot, object to and defeat those conveyances, each branch of the defence being distinct and independent.

But it is said James Fernald was in possession, and so needed not to record his title. It does not, however, appear that he was ever in possession of any part of the Denbow lot. If he had possession of any part of it, it must be taken to have been of the thirty acre lot, but even that much does not appear.

3d. James Fernald was present when the plaintiff was making purchase of the Denbow lot, and made no claim, and gave no notice that he owned or claimed any thing but the thirty acres which he did point out and claim ; he, therefore, cannot now claim any more. 5 *N. H. Rep.* 181, *Haddock* vs. *Wilmarth.* His deed was not recorded till after this action was commenced.

We also suggest this farther position : That being tenants in common and undivided of a part of the whole Denbow lot, which includes all the lots in question, as such tenants we had a right to enter upon and occupy all, and any, and every part thereof ;

and our co-tenants, if there are any, have no legal right to enter upon and destroy the private and sole property of the plaintiffs to prevent this exercise and enjoyment of our right of possession and occupancy of the common property, even though such right were exercised in a manner injurious to the common property. The redress is by action, or in chancery.

PARKER, C. J.   Upon the 11th and 18th pleas, founded upon the right of Isaac Worster in a corn-mill situated below the plaintiffs' dam, a verdict was taken by consent for the plaintiffs, and no question is made.

The 2d, 5th and 8th pleas result in issues of law.

The 2d plea is that Joseph Fernald was seized of thirty acres of land, that the plaintiffs flowed it by means of their dam, and that the defendant, as the servant of Fernald, entered and tore down part of the dam, &c.   To this there is a replication of *de injuria*, and a demurrer.

The 5th plea is that Isaac Worster was seized of one fourth of a tract of land, with a corn-mill, below the plaintiffs' dam, and the dam obstructed the water from coming to the mill, and that the defendant, as the servant of I. Worster, entered and tore down, &c.   To this there is a similar replication and demurrer.

Upon these pleadings the controversy between the parties is rather as to the application of the law, than respecting the rule itself.   The question is, whether the matter of the pleas sets up a right, or an excuse.   The result of the authorities is summed up in a note to the case *Taylor* vs. *Markham, Yelv. Rep., Metcalf's Ed.*, 158.   "When the defendant pleads or insists on a *right, title*, or *interest*, the general replication, *de injuria sua propria absque tali causa*, is bad; otherwise, when the defendant's plea sets forth matters of *excuse* merely."   "But such replication is aided by verdict."   "If, however, the title alleged be only inducement, as in the text, the general replication is proper and sufficient."   Various authorities are there cited in support of these positions, and they seem to be well settled principles, although the rules have not been deemed entirely satisfac-

tory, because such replication puts or may put several matters in issue. But it is settled that this is not a sufficient objection. 3 *Barn. & Adolph.* 2, *Selby* vs. *Bardons.*

The defendant claims no *right, title,* or *interest* in the land, or dam, which is the foundation of the plaintiffs' action, either in himself, or those under whom he acted. The right and interest of Fernald and I. Worster in other tracts form an inducement to the excuse he makes for entering upon the plaintiffs' land. In common parlance, it may be said that he claims a right to go upon the plaintiffs' land to abate the nuisance; but, within the meaning of the cases, he sets up matter in excuse for so doing.

The replications are, therefore, sufficient, and the plaintiffs are entitled to judgment upon the demurrers.

The 8th plea is, that the defendant was possessed of an undivided moiety of thirteen acres of land, and that the plaintiffs' dam flowed the tract, wherefore the defendant entered and tore down the dam, &c. The replication is, that the plaintiffs were seized of the whole tract in fee and in mortgage, and had the right of possession, and therefore by means of the dam caused the water to overflow, &c. To this there is a general demurrer, and we are of opinion that the replication is insufficient.

If the replication had alleged that the plaintiffs, before that time, had entered into possession as mortgagees, there would have been some doubt here. A mortgagee in possession is to be treated as owner, until redemption. If he should subvert the soil, pull down buildings, build dams on the land, and flow it, could the mortgager justify an entry to prevent him, or to take down a dam? If he could not, how could he justify, or excuse an entry into other lands of the mortgagee, to take down a dam there erected, or to do any other act?

But the replication does not allege any entry by the plaintiffs as mortgagees. A mortgagee not in possession is not entitled to be treated as owner, except in a suit, or some other proceeding, to enforce his rights as mortgagee. Until entry, he has no right to exercise any acts as owner. He cannot claim the rents and profits. He cannot convey the land by deed, without transferring the debt. But he may assign the debt, and thereby assign

and transfer the charge upon the land. He has no right to commit waste or destroy the property when in possession, until he has foreclosed. But there may be doubts whether there is a remedy at law, if he does so. Perhaps a remedy may be had after redemption, and a court of equity may restrain him so long as the right of redemption exists, and, on a petition to redeem, may compel him to deliver up the possession where he has committed waste. 2 *Vernon* 392, *Hanson* vs. *Derby;* 1 *Powell on Mortgages* 188, *and notes.*

It does not appear, from the replication, that the flowing of the land by the plaintiffs was in the exercise of any right as mortgagees.

It has been contended on the part of the plaintiffs, that the defendant's 8th plea is bad, because it does not allege that the defendant had any title or interest in, or right to, any part of the thirteen acres, or even that he was lawfully possessed thereof, but merely alleges that he was possessed of an undivided moiety. If the plea were bad, the plaintiffs would be entitled to judgment on the demurrer, because that would be the first fault. No authorities are cited in support of the objection bearing directly upon it, but there is an attempt to liken the case to an avowry for distress for rent. There does not seem, however, to be such an analogy as to require us to apply the same principle. By the common law it was necessary for the avowant to set forth his title, and it was held insufficient to allege that he was lawfully possessed. 1 *Johns. R.* 382. That has been altered in England by the statute 11 *Geo.* 2, *ch.* 19. But it has been held that the common law is still in force in New-York. 5 *Cowen* 340. If it is so here, but the rule is of such questionable propriety as to have been altered by statute in England, we shall not be justified in extending the principle to a plea of justification or excuse in the abatement of a nuisance, without some authority. The rights of a person holding for years are as well worthy of protection from nuisance as those of a freeholder.

An *assize* of *nuisance,* or a *quod permittat prosternere,* which not only gave the plaintiff satisfaction for the past, but removed the nuisance, lay only in favor of the tenant of the freehold,

against the tenant of the freehold, (3 *Black. Com.* 220, 222,) and a lessee for years was confined to his action on the case. 3 *Black.* 220. But I no where find it stated that the lessee for years, or any other person lawfully in possession, might not abate the nuisance. Case lies for him in possession against him in possession, 3 *Black. Com.* 222 ; and the statement of the right to abate, by the party's own act, is general. " The reason why the law allows this private and summary method of doing one's self justice, is because injuries of this kind, which obstruct or annoy such things as are of daily convenience and use, require an immediate remedy, and cannot wait for the slow progress of the ordinary forms of justice." 3 *Black. Com.* 5.

The possession alleged in the defendant's plea must be taken to be a lawful possession, which furnishes evidence of title. If it were not so, the plaintiffs might have traversed it.

Upon the 4th, 12th and 19th pleas, the parties are at issue on matters of fact, and there has been a trial, and a verdict for the plaintiffs. These pleas all allege that Isaac Worster was seized of a tract of land ; that the plaintiffs' dam caused the water to flow upon it; and that the defendant, as his servant, and by his command, broke and entered the plaintiffs' close, and tore down part of the dam, &c.

The replication to the fourth plea is *de injuria*, and issue.

To the 12th the plaintiffs reply, *precludi non*, because they say it was not necessary for the defendant to tear down a part of the dam fifty feet in length, and two feet in height at one end and six and a half feet at the other, in order to prevent the dam or any part of it from overflowing the land, &c. The rejoinder avers that it was necessary, on which issue is joined.

The replication to the 19th plea alleges that the plaintiffs did not cause the water to overflow the land at the time mentioned in that plea, (which is in answer to the 4th count,) and on this issue is joined.

Upon the trial of these issues, the jury returned a verdict for the plaintiffs on all of them.

The only questions here arise upon the rulings at the trial and the instructions to the jury.

It has been suggested on the part of the plaintiffs, that the defendant had no right to enter upon the plaintiffs' land and demolish the dam, even if it did wrongfully cause the water to overflow his land, or the land of those whose servant he was, at the time. But it is admitted that such a power has existed, and there seems to be nothing in the grant of equitable jurisdiction to this court, which can operate to extinguish it. It exists in England, notwithstanding the existence of ample jurisdiction in equity there.

On the trial, the plaintiffs offered the testimony of Theodore C. Lyman, that in 1838, while on "the Plains lot," mentioned in the 4th, 12th and 19th pleas, James Roberts, then over sixty years of age, and who died previously to the trial, pointed out a stump, on the line between his land and the lot in question, as I. Worster's corner. The defendant excepted to this evidence. It has been held in England that in questions upon boundary between parishes or manors, or on a customary right, the declarations of the common opinion of the place, made by deceased persons, who from their situation had the means of knowledge, and no interest to misrepresent, are admissible in evidence.  1 *Phil. Ev.* 198. The question in such cases partakes somewhat of a public character, and it is for that reason, probably, that declarations of the common opinion of the place are received. But in the case of a mere private boundary, if the individual was living he could not give evidence of the common opinion, but must testify to his knowledge respecting the boundary, and how his knowledge was derived. This knowledge often rests in tradition merely. The alleged boundary has perhaps been pointed out by some one who professed to have information respecting it. "Reputed boundaries are often proved by the testimony of aged witnesses, and the hearsay evidence of such witnesses has been admitted to establish such lines, in opposition to the calls of an ancient patent." 1 *Peters's C. C. R.* 496, *Conn.* vs. *Penn.* And we are of opinion that the declarations of deceased persons, who from their situation appear to have had the means of knowledge respecting private boundaries, and who had no interest to misrepresent, may well be admitted in evidence. It has been held, generally, in

Pennsylvania, that where boundary is the subject in question, what has been said in relation to it by a person deceased, is evidence. 6 *Binn. R.* 59, *Caufman* vs. *The Presbyterian Congregation of Cedar Spring.* If the witness from his situation had any interest to make the declarations, then they are not admissible. 4 *N. H. Rep.* 213, *Shepherd* vs. *Thompson.*

In this case Roberts does not appear to have had any interest to make the declaration. Although his land bounded upon I. Worster's, he had no interest in the corner in dispute. It did not affect him whether Worster's corner was at the birch stump, or whether Worster's land extended farther along side of his own, so that it would be overflowed.

Upon the trial of those issues it appeared that the plaintiffs' dam consisted of a main part, extending across the stream, and a wing dam, which was taken away by the defendant, extending up the stream at nearly a right angle with the main dam. The wing dam was supposed to be permanently secured, and could not be removed without cutting. Six feet in height of the main part of the dam was constructed by setting up posts along the top of the old dam, in the sides of which were grooves, into which loose planks were fitted, but which could be removed, or drawn up, so as to reduce the water to any point desired, not exceeding six feet. The defendant proved that he at first attempted to reduce the water in the pond by removing these planks, but they were replaced by the plaintiffs before the water was reduced much, if any, more than one foot. The defendant then cut away part of the wing dam, which was rebuilt, and it was again cut away by the defendant. The court charged the jury that if there were loose planks in the dam, which the defendant might have taken away with less injury to the plaintiffs, and which would have relieved his land from water in a reasonable time, he was not justified in cutting away the wing dam. To this the defendant excepted.

The law, under the usual practice here, gives a party two remedies, if his land is flowed. He may bring his action to recover the damages, or he may take the remedy into his own hands, and abate the nuisance. If he takes the latter course, he is bound

to proceed in a reasonable manner. The ordinary pleas in such cases allege, in substance, that the party had a right to protect his own possessions, or that others under whom he acted had the right to protect their possessions from injury, and that in doing that he *necessarily* did what was done; or that he did the acts alleged in the exercise of his rights, or as servant, exercising the rights of another, *doing as little damage as possible.*

If there is excess and unnecessary injury, it may be replied. He has not a right, because the water is on his land, to do an unnecessary injury to the adverse party, notwithstanding the latter is in the wrong. He has not even the right to take such measures as will relieve his land in the most speedy manner. If that was his right, he might blow up the dam and mills, if mills were connected with it. He cannot take the water off at once. It will necessarily take time. The law does not put into his hands an unreasonable remedy. Whether this principle was correctly stated in the instructions respecting the loose plank and the wing dam, may admit of doubt on the case before us. The party suffering the injury is not bound to exercise his right of removal in the most convenient way for the other. He may make it effectual. The instructions should have been general, that the defendant had a right to remove so much of the dam as would drain the water from his land in a reasonable time, doing at the same time no unnecessary injury to the plaintiff's property. If this is not in substance the effect of the direction which was given, it was erroneous.

But, furthermore, this point did not arise on these pleadings. The three pleas which were under consideration when those instructions were given to the jury, excuse the act of the defendant, because the land of I. Worster, called "the Plains lot," was flowed by means of the dam, and the defendant, acting under his authority, removed, &c. The replication to one of these pleas, (the 4th,) sets forth that the defendant did the act of his own wrong, and without the cause alleged. The replication to the 12th alleges that it was not necessary to tear down so much of the dam, and on this issue is joined. The replication to the 19th denies that the plaintiff caused the water to overflow the land of I. Worster, and the issue is on this.

In trespass to the person, if the defendant has pleaded a plea merely in excuse of an injury to the person, and not a justification under process, the replication *de injuria*, or *de son tort demesne*, is in general proper, if the plea be wholly untrue. But if the plea be true, and the plaintiff did in fact commit what in point of law amounted to the first assault, the plaintiff must reply specially; and it is said if the defendant's battery was outrageous, or more than was necessary for self defence, that matter should be so replied; but a *quære* is made whether *de injuria*, in such a case, is not sufficient. Matter in aggravation or an excess, however, it is said, must be new assigned. 1 *Chitty's Pl.* 410, [563] *Phil. Ed.*, 1819. In trespass to personal property, when the answer to the plea confesses and avoids it, the replication should be special. 1 *Chitty's Pl.* 565. So where, in breaking and entering the plaintiff's house, or land, felling his timber, or taking away his goods, the defendant pleads a license, which the plaintiff had revoked before any of the trespasses were committed, or which was confined to some particular thing, and the defendant exceeded it, the plaintiff must state the revocation, or excess, in a new assignment. But there are some replications which rather partake of the nature of a new assignment than are properly and strictly so. As when a man abuses an authority or license which the law gives him, by which he becomes a trespasser *ab initio*, if the defendant pleads such license, or authority, the plaintiff must reply the abuse. 8 *Co. R.* 146, [290,] (*Dub. Ed.* 1793;) 3 *Wils. R.* 20, *Dye* vs. *Leatherdale;* 3 *D. & E.* 292, *Taylor* vs. *Cole;* 1 *H. Black.* 555; 1 *D. & E.* 338, *Gundry* vs. *Feltham;* 1 *Chitty's Pl.* 567, 568.

According to the authorities thus cited, no question of excess arose on the 4th or 19th pleas.

The replication to the 12th is perhaps not a very formal new assignment, or averment of excess, but if it is regarded as a replication of that character, it merely raises a question whether the defendant tore down more of the dam than was necessary, and not whether he should have taken up loose planks from the main dam, instead of tearing down a certain portion of the wing dam connected with it. It seems to admit, impliedly, that the defend-

ant might tear down a portion of the dam in the manner he did, but it seeks to maintain the action on the ground that he tore down more than he ought.

Here, however, the plaintiffs say that these instructions were immaterial, and that they furnish, therefore, no cause for setting aside the verdict. It is said that it appears conclusively, from the plan used upon the trial by the plaintiffs, and to which the parties are at liberty to refer by the case, that it was not necessary to remove so much of the dam as was taken away, in any aspect of the case. And it is said, farther, that the jury having found, upon the issue framed on the 19th plea, that the plaintiffs did not by means of the dam cause the water to overflow any part of I. Worster's land, the instructions respecting the manner of removal were of no consequence, because that finding shows that the entire act of tearing down the dam was wrongful, so far as I. Worster's lot was in question. The verdict seems to show that these instructions could not have had any effect in the consideration of the issue framed on the 19th plea. That relates only to the fourth count. But it farther appears by the case, that the jury, under the direction of the court, found specially that the birch stump was the corner of I. Worster's land, (as was contended by the plaintiffs,) and that the part of the frog-pond owned by I. Worster was not overflowed by means of the plaintiffs' dam, at the time the dam was cut down. This finding (which it must be understood was taken by consent of parties, no objections appearing to have been made,) applies to all the different issues on trial relating to that lot; and from an examination of the plan, and the case, we must conclude that the instructions became of no importance. These appear to have been the only points where it was contended that this lot was overflowed.

There was a place upon the lot called the frog-pond, which has just been adverted to, and which appears to have been situated some little distance from the mill-pond, and there was no connection between them, unless it was under the surface of the ground. The defendant contended that the water had been raised in the frog-pond, and the banks around it overflowed. He

introduced evidence that on former occasions the water there had risen and fallen, with no perceptible cause save its connection with the mill-pond. The court instructed the jury, that no matter how it had been proved to be on former occasions, unless the defendant proved that at the time he cut away the dam the frogpond was thus flowed by the dam, he could not justify himself in that part of his defence. The defendant excepted. By this instruction the judge could only have intended that if there was evidence of flowing before the time in controversy, that could not support the pleas, but that it must be proved that the lot was flowed at the time. It could not have been intended that the flowing before, by means of the dam, if proved, had no tendency to show that, if flowed at the time, it might be by the same cause. It is not so expressed, and could not naturally be so understood.

The plaintiffs have attempted to raise a question whether the defendant was servant of Isaac Worster, on the evidence reported. The case finds that the defendant proved that Isaac Worster, who had been in the possession of the Plains lot, "gave him all the power that said Isaac lawfully might have to draw the water raised by said dam off from his land." The plaintiffs have argued that I. Worster could not communicate power to the defendant to take down the dam, and did not employ him as his servant to do the act for him. This depends upon what is to be understood by the phraseology used. It does not appear that any question was made about this matter, and we cannot say, from the language stated in the case, that there was not a request by Isaac Worster, which would render him principal and the defendant his agent. If it was not so, the argument of the plaintiffs may be correct. This does not seem to be a case in which power can be communicated by transfer or assignment, so that the defendant could act upon the right of Isaac Worster, but the latter not be responsible as principal for the act done. Isaac Worster had the right to act, if his lot was overflowed. The defendant could have no right but as his servant or agent, so far as that lot is concerned. The pleas allege that the defendant acted as the servant of I. Worster, and by his command. If he was not so, the replication *de injuria* to the fourth plea would have been well sustained, for

that reason, and the question should have been submitted to the jury. In the other two issues relative to this lot, it is admitted by the course of the pleadings that the defendant acted as servant, it being alleged and not denied.

Upon the remaining issues judgment is to be rendered according to the opinion of the court, upon the facts reported at the trial.

The first and fifteenth pleas allege that the defendant was possessed of an undivided moiety of thirteen acres, bounded, &c., part of the 4th division, lot 120, in Milton, that this land was flowed, and that he entered and tore down the dam for this cause. The 6th, 13th and 20th pleas allege that the defendant was possessed of one half of two fifths of the same thirteen acres, but are otherwise similar to the other two.

There are several different issues upon these pleas. To the 1st and 6th, the plaintiffs reply that the defendant entered of his own wrong, upon which issue is joined.

To the 13th he answers that he was seized in fee and mortgage, and had the right of possession, and therefore caused the water to overflow the land, similar to the replication to the 8th plea. The rejoinder is that the plaintiffs had not the right of possession, and the issue is upon this. It appears from the evidence that John Fall conveyed the land to the defendant, who mortgaged back the same day to secure the purchase money, and this mortgage was assigned to the plaintiffs, and held by them at the time when the defendant cut down the dam, as alleged in the third count, to which this plea is an answer. If, then, Fall's deed to the defendant conveyed to him the title under which he attempts to justify or excuse his entry, it is apparent that his mortgage back, assigned to, and held at the time, by the plaintiffs, gave them a right of possession, which is all that is involved in this issue. As against the defendant, they had the right, for they might enter at any time under the mortgage.

But a question arises here whether this issue is material, and this is settled by the opinion we have already expressed upon the demurrer to a similar replication to the 8th plea. Notwithstanding the plaintiffs had the right of possession by virtue of their

mortgage, they had no right thereby to flow the land, and the establishment of the right of possession, therefore, under this issue, does not entitle them to a judgment. But their right of possession being clear, the defendant cannot have a verdict or judgment on this issue. The issue being immaterial, a repleader must be awarded. 2 *Tidd's Pr.* 829; *Hobart's R.* 56, *note,* (*Williams' Edition.*)

The replications to the 15th and 20th pleas allege, in the same manner, that the plaintiffs were seized in mortgage, and had the right of possession, and then aver that they were actually possessed, and traverse the defendant's possession. The issue is on the traverse.

The issues on the 1st, 6th, 15th and 20th pleas, therefore, result in the same matter, viz., a denial of the defendant's possession.

On these issues the defendant relies upon the deed from Fall to himself, and the plaintiffs upon the mortgage from the defendant to Fall, with evidence that they, prior to the time when the defendant cut down the dam, surveyed the lot, along with other lands, and flowed it. If this survey and flowing constituted a valid possession on the part of the plaintiffs under the mortgage, the possession of the defendant would be negatived by the evidence, and the plaintiffs entitled to a verdict on these issues, notwithstanding the mortgage was afterwards redeemed. Had this deed been absolute, instead of a mortgage, the mere survey of the lot would have been a sufficient possession, the survey constituting an entry under color of title. And it would, moreover, have given them a valid title as against the defendant, carrying seizin along with it. A mortgage title, however, demands a different consideration. We have already adverted somewhat to the nature of it in our remarks upon the 8th plea. The mortgager is seized against all the world except the mortgagee, and against him except so far as he may rightfully maintain his seizin under the mortgage. The mortgage is regarded in this State as a mere security, except for the purpose of the remedy upon it when the mortgagee or his assignee please to enforce it. Then it is treated as a conveyance of the fee. 11 *N. H. Rep.* 55,

*Smith* vs. *Moore; Ditto* 274, *Ellison* vs. *Daniels; Rigney* vs. *Lovejoy,* [13 *N. H. Rep.* 247.] A mere survey of that and other lots, therefore, for the purpose of obtaining information respecting boundaries, cannot be regarded as a possession under the mortgage, because it does not appear to have been an entry for the purpose of asserting a title under it, or with a design of foreclosing. The purpose of the survey in this case is not stated. If it is not to be inferred that it had relation to the flowing of the lot, it cannot be concluded that it was a taking of possession for the purpose of securing the profits, or with a view to foreclosure. And we are of opinion that the flowing of the lot with water, by means of a dam erected elsewhere, cannot be regarded, of itself, as a possession under the mortgage title. It is not a just exercise of any right under the mortgage. Without title it is a tortious act, and a mortgage cannot change its character, for the reason just stated. The mortgage was made to secure a debt, and to enable the creditor to obtain payment or satisfaction; not to authorize him to erect a dam elsewhere, and flow the land mortgaged for purposes not connected with the debt, and not authorized by the nature of a mortgage.

Had the plaintiffs been in possession, as mortgagees, previous to the flowing of the land, the result on these issues might have been different, (*ante,*) but this is not clear. They did nothing previous, unless it was to survey the lot for the purpose of ascertaining its boundaries.

The fact that they consulted counsel after the water was on, and were told that what they had done was enough, does not seem to alter the case.

Coming more immediately to the question of the defendant's possession, we find nothing in the case to show that he, or Fall, who conveyed to him, ever was in the actual possession of the thirteen acres. Whether he had any possession, then, depends upon the validity of his title. If he had a legal seizin, that is sufficient possession. 7 *N. H. Rep.* 15, *Frost* vs. *Cloutman;* 15 *Mass. R.* 214, *Goodwin* vs. *Hubbard;* 1 *Hilliard's Abr.* 24.

It appears from the pleadings that this tract of thirteen acres is parcel of fourth division, lot 120, in Milton, which was origin-

ally drawn to the right of Salathiel Denbow, and is familiarly called the Denbow lot. The title to the Fall lot, as it has been called, depends upon the same principles which must govern that part of the case arising under the pleas in which the defendant alleges that Joseph Fernald was seized in fee of a part of that lot, and they may therefore be considered together, so far as the title is concerned.

The 9th and 16th pleas allege that Joseph Fernald was seized in fee of a tract of meadow land, containing about thirty acres, bounded, &c., in the Denbow lot, and that the defendant entered by his command, &c.

The 7th, 14th and 21st pleas allege that he was seized in fee of one fourth part of the same thirty acres. To the 7th plea the plaintiffs have replied that the defendant acted of his own wrong, and without the cause alleged, upon which issue is joined. In the replications to the other four of these pleas they have traversed the seizin in fee of Joseph Fernald, and tendered an issue, which is joined. The evidence shows that the defendant had a power of attorney to act for Joseph Fernald in the matter, and the issue, therefore, on the 7th plea, raises only the same question, respecting title, which is raised by the other four issues. There seems to be no doubt that Joseph Fernald was seized in fact of the thirty acre lot, claiming a fee, but no question has been made on that. Both parties have treated these issues as raising the question whether Joseph Fernald was seized in fee by a legal title. Perhaps this is the legal import of the pleadings.

This brings us to the title to the Denbow lot, and the multifarious conveyances connected with it.

In 1795, Samuel Palmer, Beard Plumer, senior, and Joseph Plumer, senior, owned the Denbow lot in common, Palmer having the title to half of it, and the others to one quarter each.

In 1802, Palmer conveyed to Ivory Hovey his half.

In 1814, Hovey conveyed to Thomas Leighton all the land he owned in Milton, excepting such parts as he had conveyed to Palmer and others. This deed must be held to have passed the title to half of the lot to Leighton, because there is nothing to show that Hovey had conveyed to Palmer, or any one else, any portion of this lot.

In 1815, Leighton conveyed three eighths of the lot to Joseph Plumer, junior.

In 1816, Joseph Plumer, junior, conveyed to Beard Plumer, senior, three sixteenths.

At this time, then, the title stood in Beard Plumer, senior, seven sixteenths, Joseph Plumer, senior, four sixteenths, Joseph Plumer, junior, three sixteenths, and Thomas Leighton two sixteenths.

The argument of the defendant's counsel assumes that Hovey conveyed back to Palmer one fourth of the half he had purchased of him. But aside from the fact that Leighton, after he had conveyed three eighths to Joseph Plumer, junior, made no farther conveyance for a long period, and does not seem, in the mean time, to have asserted any title to the other eighth, there seems to be nothing to support this position. The case finds that in 1807, Palmer conveyed to Hovey, in mortgage, " the same quarter part of the estate that day conveyed by Hovey to Palmer," but that deed from Hovey to Palmer is not in the case, and there is nothing to show what land it covered. It may have been part of this lot. It may, as well, have been part of some other lot. If it was a conveyance of part of this lot, it may, for aught which appears, have been a quarter of the whole lot, instead of a quarter of half of it. If the latter, why was it not described as one eighth? Palmer does not appear to have asserted any title afterwards, which tends to show that that deed and mortgage related to a quarter of something else. If it had been shown that the deed conveyed part of this lot, the neglect would be immaterial. Leighton's neglect to assert a title to the one eighth until 1837, cannot operate as an abandonment, he having had title, and there having been no adverse possession.

Pursuing the chain of title, the case finds that Beard Plumer, senior, October 5, 1816, devised two sixteenths of the Denbow lot to Joseph Plumer, junior, and three sixteenths to John Plumer. He also devised to John Plumer the use and occupancy of all his real and personal estate, (a part of which was his remaining interest in the Denbow lot,) except what was before devised, he paying one half of the debts and legacies, and if he died with-

out issue the said property to go to Joseph Plumer, junior, and Beard Plumer, junior, in equal shares.

The defendant's counsel construe this devise over as including the three sixteenths given to John Plumer, but the plaintiffs' counsel has considered it applicable only to the remaining two sixteenths not specifically devised in the will. If this matter were important it might require a more precise statement of the language of the will. It does not seem, however, to affect the result. Assuming the construction of the plaintiffs' counsel, on the decease of John Plumer half of the two sixteenths went to Joseph Plumer, junior, by the executory devise, and the three sixteenths specifically devised to John, with the remaining two sixteenths, descended to Joseph Plumer, junior, Enoch Plumer, Betsey Hall, Susan Brown and Mary H. Plumer. Joseph Plumer, junior, it appears, then purchased the shares of all except Mary H. Upon the construction of the defendant's counsel, the result will be only to reduce the fraction of Mary H., which is an immaterial matter in this case.

The date of the decease of Beard Plumer, senior, is not stated in the case, nor does it seem to affect the result.

On the 17th of May, 1819, Joseph Plumer, senior, conveyed to Joseph Plumer, junior, his quarter of the lot.

Joseph Plumer, junior, thus acquired title, by these different conveyances, to all the Denbow lot except the share of Leighton, two sixteenths, and the share of Mary H. Plumer, one twentieth, or one thirty-second part, as the case may be.

Before he had obtained the conveyance from Joseph Plumer, senior, and perhaps before he acquired title under Beard Plumer, senior, he began to make conveyances of portions of the lot.

On the 13th day of February, 1819, he conveyed to James Fernald twenty-five acres, in common, in the lot. This conveyance forms the subject matter of another part of the case, to be considered hereafter.

On the 20th September, 1821, he conveyed to James Fernald thirty acres of the lot, by metes and bounds, with warranty. The deed was recorded May 1, 1826, and James Fernald, December 21, 1831, conveyed the same to Joseph Fernald.

On the 28th of March, 1821, Plumer conveyed one hundred and fifty acres of the lot, (it is understood, by metes and bounds,) thirteen acres of which, through several mesne conveyances, have come to the defendant, by the deed of John Fall, as before stated, provided those conveyances by Joseph Plumer, junior, are valid.

On the 10th of May, 1837, Sally Plumer, being then the owner of the share of Mary H. Plumer, conveyed all her right in the Denbow lot to the plaintiffs, and on the next day Leighton conveyed all his right to them, and the plaintiffs object that the conveyances by Joseph Plumer, junior, in severalty, by metes and bounds, as before mentioned, were void as against the other tenants in common with him, whose titles they have thus purchased.

The general rule seems to be well settled, that one tenant in common cannot, as against his co-tenants, convey a part of the common property in severalty by metes and bounds, or even an undivided share of such part. The authorities cited by the plaintiffs' counsel sufficiently establish the principle. 24 *Pick. R.* 329, *Peabody* vs. *Minot;* 5 *Conn. R.* 366, *Griswold* vs. *Johnson;* 4 *Kent's Com.* 368; 9 *Vermont R.* 138, *Smith* vs. *Benson.* The reason is obvious. His title is to an undivided share of the whole, and he is not authorized to carve out his own part, nor to convey in such a manner as to compel his co-tenants to take their shares in several distinct parcels, such as he may please.

It is suggested on the part of the defendant that the true rule probably is, that one co-tenant cannot convey in severalty to the prejudice of his co-tenants. Such is the expression in some of the cases; but this is because it assumes that a conveyance of part in severalty, without their assent, is, of course, to their prejudice. If their assent is manifested in a proper manner, there is no occasion for the application of the rule. Other cases say that as against co-tenants the deed is void. 4 *Conn. R.* 495; 5 *Conn. R.* 363.

The fact that neither Leighton or Mary H. Plumer ever objected, cannot show that the conveyance was not to their prejudice, or that they assented. They were not bound to assert their

title by an objection to an unlawful conveyance, nor had the lapse of time been such as to bar any of their rights.

The defendant suggests farther, that the plaintiffs acquired their title as tenants in common under Leighton and Mary H. Plumer, with full knowledge of the conveyances in severalty to Fernald and Miller. But this does not seem to affect this part of the case. If the conveyances from Joseph Plumer, junior, had been in the exercise of his lawful rights, notice of these conveyances might in certain events be material. But notice of an invalid conveyance cannot make it good. The plaintiffs took all the rights their grantors had.

The defendant farther objects, that the plaintiffs are precluded from contesting the title of Joseph Fernald to the thirty acres, and of himself to the thirteen acre tract, because they have taken conveyances of the residue of the tract of one hundred and fifty acres, of which the thirty and thirteen acres are parcels, from persons holding under the grant to Miller, and other conveyances from persons holding under other deeds in severalty from Joseph Plumer, junior, in some of which the land is described as bounding upon land of Joseph Fernald; and furthermore, because the plaintiffs have taken an assignment of a mortgage of the thirteen acres, made by the defendant, and have thereby recognized his title to that part of the lot. But the principle of estoppel does not seem to apply here. The grantee in a deed poll is not estopped to deny that his grantor had such an estate as he undertook to convey. 1 *Stark. Ev.* 302; *Co. Litt.* 363, 6; *Strange* 610, *Skipwith* vs. *Greene; Yelv.* 226, *note; 3 Barn. & Ald.* 426, *Hunter* vs. *Fry, per Holroyd*, J.; 10 *N. H. Rep.* 408, *Otis* vs. *Parshley*. The plaintiffs are not here denying the validity of conveyances by their grantors, to which they stand in privity by the acceptance of their deed. Joseph Fernald and the defendant have nothing to do with the lands of which the plaintiffs thus took deeds. The plaintiffs are not obliged to claim under those deeds, and do not set up any title under them in the present case. Those deeds, therefore, cannot estop the plaintiffs from denying the right of Joseph Plumer, junior, to convey something else, which they do not, and cannot, cover.

The defendant farther objects, that the plaintiffs are precluded

from avoiding the titles of Joseph Fernald and himself under the deeds of Joseph Plumer, jr. in severalty, because they have contracted with Sally Plumer, who is widow of Joseph Plumer, jr., and executrix of his will, to save the estate and heirs of Joseph Plumer, junior, harmless from all damage on account of his not being the owner of the several tracts in the Denbow lot which he has conveyed in severalty. It is argued that the plaintiffs cannot create the injury against which they are bound to save the estate and the heirs harmless. The objection is based upon the principle of estoppel to avoid circuity of action. 7 *N. H. Rep.* 76, *Robinson* vs. *Leavitt.* But here again the answer of the plaintiffs' counsel is conclusive. The heirs and the estate of Joseph Plumer, junior, are not parties or privies to that contract. It purports to have been made in consideration of the conveyance, by Sally Plumer, of the share formerly owned by Mary H. Plumer, which Sally Plumer held by purchase from Hall & Hannaford in her own right, and she has the entire control of it. If she sees fit at any time to release the plaintiffs, or refuses to enforce the agreement, the plaintiffs cannot be compelled to make good the damages they may occasion. The principle, therefore, cannot apply, as it might if the plaintiffs were answerable to the heirs of Joseph Plumer, junior, who are bound by the covenants in his deed.

It has been farther suggested, that if the deeds to Fernald and Miller are not good in severalty, they may be good for such proportion of the lot as the thirty, and one hundred, acre tracts bear to the whole lot; but this cannot be as against the plaintiffs, the other tenants in common. They are not conveyances of so many acres of the whole undivided, nor can they be made to operate as if they were so. They cannot be extended so as to include lands not contained in their boundaries. Nor can they even be held good as against the other tenants in common of the Denbow lot, for any portion of the land embraced in them, upon the facts which we have thus far considered, without a partition.

If Joseph Plumer, junior, or his heirs, had retained a legal interest as tenants in common in the lot; upon the avoidance of his deeds in severalty, by the other tenants in common, as being

inoperative against them, a partition might be made, and if on that partition the lands, or any portion of them which are embraced in those deeds, fell to the title of Joseph Plumer, junior, as tenant in common, to that extent his grantees in severalty might again enter, by force of the warranty, claiming the title acquired on partition, through an estoppel, not only against the grantor himself and his heirs, but against purchasers under him with notice. 5 *N. H. Rep.* 533, *Kimball* vs. *Blaisdell;* 12 *Mass. R.* 354 ; 16 *Maine R.* 391, *Duncan* vs. *Sylvester.*

The conveyances in severalty by Joseph Plumer, junior, who was in possession as tenant in common, were good as against himself and his heirs, and all persons claiming under him or his heirs with notice, or having no better title. They were invalid only as against Leighton and Mary H. Plumer, and those claiming under them. When Joseph Plumer, junior, died, his heirs could take nothing in those tracts, thus conveyed in severalty, against the deeds of their ancestor. They would be estopped to say that he had not such a title as he conveyed, that his deeds were, therefore, invalid, and that the land descended to them. And any conveyance from them to the plaintiffs, if it might pass to the plaintiffs an interest in common in any portions of the lot not conveyed, could not authorize the plaintiffs, as tenants in common under Joseph Plumer, junior's, title, to treat his conveyance in severalty as invalid. 1 *N. H. Rep.* 43, *French* vs. *Lund;* 12 *Mass. R.* 354, *Bartlett* vs. *Harlow; Ditto* 474, 479, *Varnum* vs. *Abbot;* 5 *Day's R.* 483, *Hoyt* vs. *Dimon;* 7 *Conn. R.* 220, *Stow* vs. *Wyse;* 22 *Pick. R.* 316, *Nichols* vs. *Smith;* 24 *Pick. R.* 324, *White* vs. *Patten.*

And here a question arises on the suggestion of the defendant's counsel that the plaintiffs acquired title after two of the acts of the defendant, upon which the suit is founded, were committed. It appears that the plaintiffs acquired Mary H. Plumer's share on the 10th of May, and Leighton's on the 11th of May. On the 1st and 29th of April, then, when the defendant cut down the dam, as alleged in the first and second counts of the declaration, Joseph Fernald and the defendant, although they had no valid title as against Leighton, and against Joshua G. Hall, who then

held the title of Mary H. Plumer, had a good seizin in fee against the plaintiffs. The plaintiffs had no authority to flow their lands. They must have answered to them in damages, and could not at that time object to their authority to remove, in a lawful way, what, as between the parties, on the state of facts then existing, was a nuisance to the possession of Joseph Fernald and the defendant.

But on the 10th of May, when the plaintiffs procured the conveyance of the shares of Mary H. Plumer and Leighton, the state of the case became changed. The plaintiffs, then, as tenants in common, might well deny the titles of Joseph Fernald and the defendant to hold in severalty, and might enter on the lands, and do any acts as owner, being answerable to no one unless he could show a title in common. Neither Joseph Fernald or the defendant could after that time maintain an action against the plaintiffs, and of course the defendant had no right, on this state of facts, to take down the dam on the 11th and 13th of May, as stated in the third and fourth counts.

Stopping here, without adverting to the effect of the deed which the plaintiffs took from the heirs of Joseph Plumer, junior, on the 24th of February, 1837, of all the land in the Denbow lot flowed by the dam, (which, it is said, was in fact the whole lot,) the result would be, that on this branch of the case the defendant had maintained his defence on the pleas applicable to the first and second counts, being the first, sixth and seventh, and that the plaintiffs were entitled to a verdict and judgment on the remaining issues, relating to the thirty and thirteen acre tracts, being the 15th, 9th, 16th, 20th, 14th and 21st.

The operation of the deed from the heirs of Joseph Plumer, junior, to the plaintiffs, upon these issues, will be considered hereafter.

We proceed to consider the questions raised by the pleas alleging that James Fernald was seized in fee of an undivided part of the Denbow lot, equal to twenty-five acres in common and undivided, excepting thirty acres of the lot conveyed to Joseph, and that the defendant as his servant did the acts of which the plaintiffs complain. These are the 3d, 10th and 17th pleas. The replication to the 3d plea, that the defendant did the acts of

his own wrong, on which issue is taken, might raise a question respecting his authority from Fernald, such as was suggested by the plaintiffs in that part of the case relative to Isaac Worster's "Plains lot." The evidence is that James Fernald told the defendant he gave him full authority to clear his land. The question whether this constituted him a servant, might be a question of fact, depending upon intention, to be found by the jury. But this turns out to be unimportant. The issues, therefore, are all to be considered only as they raise a question of title in James Fernald, which is the particular issue on the other two.

In support of this branch of the defence, the defendant relies upon a deed from Joseph Plumer, junior, to James Fernald, February 13th, 1819, conveying twenty-five acres in common and undivided in the Denbow lot.

It is objected, on the part of the plaintiffs, that this deed is void for uncertainty, but this objection cannot avail. The deed is a conveyance of twenty-five acres, not in severalty but in common, in the lot. If the lot contains three hundred acres, this is a conveyance of one twelfth of it. If it contains more or less, the proportion can readily be ascertained by a survey. *Id certum est,* &c.

The next objection is, that this deed was not recorded until May 30th, 1837; that the plaintiffs, on the 24th of February, 1837, purchased of the children and heirs of Joseph Plumer, junior, all the Denbow lot then flowed by the dam; that the whole lot was in fact so flowed at that time; that this deed to James Fernald was not then on record, or known to them, when they took their deed from the heirs, and that the deed is, therefore, invalid against them.

The deed to James Fernald was not in fact recorded until May 30th, 1837, and the case is, therefore, within the well known rule that a prior conveyance, not recorded, is invalid against a subsequent grantee, under the same title, without notice, unless there are some special circumstances which may affect the case. The conveyance would be good against Joseph Plumer, junior, and his heirs, without record, but purchasers under him, or his heirs, stand in a different situation.

The defendant's counsel has contended that so long as grants do not impinge, there is no necessity for a record; but this part of the argument was more particularly applicable to the evidence showing that Joseph Plumer, junior, had sold to other persons divers portions of the lot in severalty, and that the plaintiffs had acquired title under some of the grantees of those portions. The principle is correct, but the application fails. Joseph Plumer, junior, might have conveyed to one, twenty-five acres in common, to another, thirty acres, and so on, until his interest was exhausted, and there would be no necessity for a record of these conveyances, in order to protect the prior against the subsequent purchasers. Each would be consistent with the other, and all might have their shares on partition. If he conveyed beyond his interest, in this manner, then the grants would impinge, and a record become important.

The plaintiffs' counsel contend that the grants in severalty by Joseph Plumer, junior, under which they show conveyances of part, impinge upon this grant to James Fernald. But the plaintiffs have objected to those grants, and say that they are invalid against them, because they are tenants in common of the lot; and we have seen that they are so, at their election. This part of the argument seems to treat them as valid. Whether the plaintiffs can treat those conveyances at the same time both as void and valid, (void as against the plaintiffs holding as tenants in common, and valid to enable them, holding under those conveyances, to defeat the deed of James Fernald of an interest in common,) will be considered hereafter. The conveyance by the heirs of Joseph Plumer, junior, to the plaintiffs, embracing the whole lot, does directly impinge upon the prior conveyances of their ancestor, and under this the plaintiffs also object to the deed to James Fernald, because it was not recorded.

The defendant farther suggests, that James Fernald was then in possession, and that this was notice, and equivalent to a record. But this, as alleged by the plaintiffs' counsel, does not appear from the case, nor is there anything to lead to a supposition that, if in possession, he probably occupied anything except the thirty acres which were conveyed to him, and which he afterwards con-

veyed to Joseph. The deed of that was on record, and would explain his possession so far. 8 *N. H. Rep.* 264, *Rogers* vs. *Jones.* Why it was that he never attempted to exercise any rights under his deed of the twenty-five acres does not appear. But this neglect alone would not have barred him from asserting his title, if the deed had been recorded. Like Leighton, he could not, by the neglect, have been regarded as abandoning his title, while he held a deed.

There seems, then, to be no valid answer to the objections to this deed urged by the plaintiffs under the conveyance from the heirs of Joseph Plumer, junior; and considering this part of the case separately, they are entitled to a verdict and judgment on the third, tenth and seventeenth issues.

But a question arises here, which carries us back again to that part of the case founded on the alleged rights of Joseph Fernald in the tract of thirty acres, and of the defendant in the tract of thirteen acres. If the plaintiffs set up title under their deed from the heirs of Joseph Plumer, junior, and thereby defeat the title of James Fernald to the twenty-five acres in common, conveyed to them, because that deed was not recorded, can they at the same time deny the titles of Joseph Fernald to the thirty acres, and of the defendant to the thirteen acres, derived from the conveyances of Joseph Plumer, junior, in severalty? Those conveyances, as we have seen, were valid against Joseph Plumer, junior, and his heirs, and every other person except the tenants in common with him. The plaintiffs, claiming under Joseph Plumer, junior's, title, would be bound by those conveyances, previously made by him, and duly recorded. That title could not authorize them to disturb the possession of Joseph Fernald, or any other of the grantees of Joseph Plumer, junior. Can the plaintiffs stand in any better situation in this respect, because they have also a title as tenants in common of the lot, under Leighton and Mary H. Plumer?

The plaintiffs' counsel have suggested that the plaintiffs may avail themselves of both titles separately: in effect, that they may avoid the deeds of Joseph Plumer, junior, in severalty, because they hold as tenants in common, and then take the land under their

conveyance from his heirs, as if those deeds had never been executed. And this is necessary to the maintenance of their suit against the rights set up by the defendant, under the several titles on which he relies. He must otherwise prevail, either on the title of Joseph or James Fernald, to say nothing of his own claim to the tract of thirteen acres. But we are of opinion that this position of the plaintiffs cannot be maintained. If it might be, the plaintiffs, by the union of their rights as tenants in common under Leighton and Mary H. Plumer, with their rights under the deed of Joseph Plumer, junior, would be able to take to a much greater extent than any individuals could take who held those different titles separately. If the titles of Leighton and Mary H. Plumer were held by any third person, that person, treating the deeds of Joseph Plumer, junior, in severalty as invalid, might have a partition. But that partition could give him but a small portion of the lands conveyed by Joseph Plumer in severalty, even if his whole share was set off in those lands. So far as he obtained any portion of the lands embraced in those deeds, so far the deeds would become entirely inoperative. But if his share was set off in another part of the lot, the grantees under those deeds would have obtained a valid title to the whole land described in their deeds, by means of the partition, as we have already seen. Their title would be good to all embraced in their deeds, which he did not take. The plaintiffs, claiming under the heirs of Joseph Plumer, jr., could not avail themselves of those proceedings to hold any thing within those grants. And their rights under a deed from the heirs cannot be enlarged by any purchase of the shares of other tenants in common. They cannot take under that deed what they are estopped from claiming under it by the prior deeds of Joseph Plumer, jr., (from whom the title under it is derived,) by reason of any other conveyance they may have of something else. Nor can the conveyance from the other tenants in common operate to give to the plaintiffs more than the undivided shares of those tenants in these lands; and the plaintiffs cannot, on any partition, claim more, under this conveyance, than those shares, because they have a deed from Joseph Plumer, junior. Notwithstanding this conveyance, they stand in the place of Jo-

seph Plumer, jr., representing and claiming under his title also, and except as to the undivided shares derived from Leighton and Mary H. Plumer, they are still bound by the estoppel which would have bound him if he was now asserting his title as tenant in common, which they assert derived from him. They cannot stand upon the land, under their different grants, and take the whole of it, when their grantors, collectively, could not have done so.

Standing in this situation, therefore, they cannot claim more of the lands thus conveyed by him in severalty than a fractional part of them, equal to the fractional right of Leighton and Mary H. Plumer in the whole. To that extent we think they are fairly entitled to avoid those deeds by virtue of their title as tenants in common under Leighton and Mary H. Plumer, because their grantors did not assent to those conveyances, and might, therefore, have avoided them thus far. Representing Joseph Plumer, junior, as they do at the same time, the plaintiffs can go no farther than that.

If it was necessary, in order to prevent the deeds to the plaintiffs from operating to an extent greater than what their several grantors had a right to convey, we might be bound to regard them as holding the title in trust for those to whom Joseph Plumer, junior, had conveyed in severalty, except so far as the shares of Leighton and Mary H. Plumer extended. 1 *Shepley* 351.

If their case would admit of it, the plaintiffs might perhaps be entitled to waive one branch of their title, and elect to claim under the others alone. 1 *Hilliard's Abr.* 450, *pl.* 43. But if they waive the conveyance from the heirs of Joseph Plumer, junior, they let in the title of James Fernald and others, so far as it would avail without interfering with Leighton and Mary H. Plumer. If they use that conveyance, they are bound by the other conveyances made by Plumer, so far at least as to admit his several grantees as tenants in common with themselves of the lots which he conveyed in severalty.

There seems, then, to be no view of the case which will enable the plaintiffs successfully to avoid all the titles upon which the defendant relies. The part of the argument before adverted to, that the deed to James Fernald, in common, is invalid for want of

record, because the grants of Joseph Plumer, junior, in severalty, impinge upon it, must be based upon their validity, and the plaintiffs cannot treat them as void and valid at the same time.

It has been argued that James Fernald cannot be allowed to claim or hold under his deed in common against the plaintiffs, because he was present and knew that the plaintiffs were making purchases of the Denbow lot, and made no claim, and gave no notice that he claimed any thing, except in the thirty acres. But the evidence fails to make out an estoppel of this character. He does not appear to have been present when the heirs of Joseph Plumer, junior, conveyed to the plaintiffs. If he had been, and it had then been said that the conveyance embraced all the lot, he could have been estopped only as against that deed, and the plaintiffs, to avoid his title, must use that deed, as they have done. Nor was he present when any other deed was made which appears to affect his claim. That he was present when the plaintiffs were surveying there, and knew they were about purchasing; pointed out the boundaries of the tract which was conveyed to him in severalty, and which he conveyed to Joseph; spoke of it as his; refused to sell, and refused to assent to the flowing of it, cannot estop him from setting up any title he may have, which is otherwise valid. 2 *Metcalf's R.* 423, *Parker* vs. *Barker ; Parker* vs. *Brown, ante* 176. He did not stand by and see any one sell what he now claims as then belonging to himself, nor does it appear that he understood that any conveyance was to be made which would include anything before conveyed to him.

The plaintiffs, relying upon their deed from the heirs of Joseph Plumer, junior, on the whole evidence before us, then, are tenants in common with the defendant in the tract of thirteen acres, and with Joseph Fernald in that of thirty acres, and their counsel have argued that as tenants in common of the whole Denbow lot, including all the lots in question, they had a right to enter upon and occupy all those lots, and that their co-tenants could have no right to enter upon the sole property of the plaintiffs, and destroy it, to prevent the plaintiffs from exercising their right of occupying the common property, even if they occupied in a manner injurious to their co-tenants.

But we are of opinion that this position cannot be maintained. As tenants in common, the plaintiffs might enter upon those lots, and exercise acts of ownership, but their co-tenants have an equal right of entry and possession. If one co-tenant excludes another, the latter may have an action ; but he may, also, if he can without a breach of the peace, regain his possession without suit. For this purpose he may do what a sole owner might lawfully do. One tenant in common has no right, by means of a dam erected on land of which he is sole owner, to flow the land owned in common, without the assent of his co-tenant, and thus exclude his co-tenant from the possession. It is in fact an ouster. 9 *N. H. Rep.* 502, *Odiorne* vs. *Lyford;* 13 *Maine R.* 353, *Thomas* vs. *Pickering, and cases cited;* 12 *Mass. R.* 352. As the plaintiffs, therefore, cannot justify or excuse the flowing of the land, the wrong to their co-tenants is of the same character, and the remedies must be the same as if the latter were sole seized.

There is, perhaps, one other point to be considered, arising out of the view we have thus taken of the rights of the parties.

In one set of the pleas, founded upon his own title, the defendant alleged himself to be possessed of an undivided moiety of the tract of thirteen acres. In another, he alleged that he was possessed of one half of two fifths of that tract. His possession, as before stated, was dependent upon his title. In one set of the pleas, founded upon the title of Joseph Fernald, he alleged that Fernald was seized of the thirty acre tract in fee, and in the other set he alleged that he was seized of one fourth part of that tract.

The plaintiffs' counsel, in one part of their argument, contended that the evidence was wholly insufficient, and failed to make out that Joseph Fernald was seized of the whole thirty acres, or of one fourth in common ; and in another part suggested that, as Joseph Fernald and James Fernald were neither of them seized, &c. as the defendant alleged, the plaintiffs were entitled to judgment. If this was intended as a position that the defendant was bound to prove the title precisely as he alleged it, although we were at first inclined to doubt the doctrine, it seems, on examination, to be sustained by authority.

" The manner of showing title," says Stephen, in his Treatise on Pleading, " both where it is laid in the party himself, or the person whose authority he pleads, and where it is laid in his adversary, having been now considered, it may next be observed, that the title so shown must, in general, when issue is taken upon it, be strictly *proved*. With respect to the allegations of *time, quantity* and *value*, it has been seen that they in most cases do not require to be proved as laid, at least if laid under a *videlicet*. But with respect to *title*, it is ordinarily of the substance of the issue ; and therefore, according to the general principle stated in the first chapter of this work, requires to be maintained accurately by the proof. Thus, in an action on the case, the plaintiff alleged in his declaration that he demised a house to the defendant for seven years, and that during the term the defendant so negligently kept his fire that the house was burned down ; and the defendant having pleaded *non dimisit modo et forma*, it appeared in evidence that the plaintiff had demised to the defendant several tenements, of which the house in question was one ; but that with respect to this house, it was, by an exception in the lease, demised at will only. The court held, that although the plaintiff might have declared against the defendant as a tenant at will only, and the action would have lain, yet having stated a demise for seven years, the proof of a lease at will was a variance, and that in substance, not in form only ; and on the ground of such variance judgment was given for the defendant." *Stephen on Pleading* 226. The case cited is *Cudlip* vs. *Rundle, Carth.* 202, and the principle decided is correctly stated by Stephen. *See, also,* 6 *Conn. Rep.* 156, *and auth. cited.*

The counsel who drew the defendant's pleas seems to have supposed the rule to be so, and for that reason filed pleas containing different statements of the legal interest. But the proof, as it turns out, does not support either allegation. It is as much a variance to allege a seizin in fee of the whole, when the party is seized only of ninety-nine one hundred and twentieths, as it is to allege a lease for seven years, when, by reason of an exception, by which the lessor had the right to occupy one house if he pleased, it became, as to that house, a lease at will only. Such was the case in *Carthew*.

Where a party brings an action to recover a tract of land, declaring on a seizin in fee, his action is sustained if he shows a title to an undivided part of it, and he recovers according to his title. But that principle seems not to be applicable to a case where he alleges a particular title as the ground of excuse or justification for an act which would otherwise be a trespass.

Had the defendant brought an action against the plaintiffs to recover damages for flowing the thirteen acre tract, alleging that he was seized of a moiety of that land, upon the authorities cited he must have failed, the allegation being special, and the proof showing that he was seized of a different interest than that which he alleged.

On these pleadings, therefore, the plaintiffs are entitled to judgment, on account of the variance. But under such circumstances we may decline to render a judgment on the case submitted to us, and give the defendant leave to amend, on the payment of costs.