Hon. GEORGE A. BRAYTON, Chief Justice.
Hon. THOMAS DURFEE, Associate Justice.[1]

---

## WILLIAM BEACH LAWRENCE vs. RICHARD M. STAIGG.

A decree had been entered that a sale of land from L. to S. should be rescinded in case S. should fail, neglect, or refuse to pay a certain amount to L. within a certain time. *Held*, that when S. went to the residence of L. on the last day of the time'so limited, for the purpose of paying said sum, and found that L. had left the state, and no one was there authorized to receive the money, there was no failure, neglect, or refusal, on the part of S. to pay it, within the meaning of the decree, if he was then ready to pay it.

*Held, further*, that a readiness on the part of S. to pay the required sum in national bank notes was not a readiness to make the payment required by the terms of the decree.

S. with his counsel G. went to a bank on the last day so limited and presented a check, and G. requested the teller to give him the money in legal tender, meaning, as he afterwards deposed, greenbacks, so called, or United States national bank notes, and, as he afterwards stated, believed the request was complied with. S. and G. went with the money so received to the house of L., then out of the state, and tendered the money to. his son I., who refused to receive it, saying he was not authorized to act for his father.

---

[1] Mr. Justice Potter, was present at this term of the court, but did not now or at any time sit in the above entitled case of *Lawrence* v. *Staigg*.

Lawrence v. Staigg.

I. deposed that he remarked it seemed to him that if they wished to make a valid tender it should be gold, and that G. replied that bank notes were good enough for him. The affidavit of the teller who cashed the check was not produced. *Held*, that the burden of proof being on the defendant, a master in chancery having found upon this evidence that the defendant was in default in not having legal tender notes with him, the finding of the master would not be set aside as erroneous.

The passing of a decree in equity for the rescission of a sale of land, unless the vendee pay to the vendor within a certain prescribed time a certain sum of money (for an additional number of feet the land has been found to contain over what it was supposed to measure when sold), does not preclude the court from again enlarging the time for such payment upon a proper case presented to them. A change of the decree enlarging the time of payment, so long as the parties are in court awaiting the execution of the decree, is properly made upon motion, if made at all.

Where it appeared in evidence that the vendee meant to pay for the surplus land, and applied to a bank for the money in United States notes, and probably obtained them, and carried the money to the vendor's house, where he found no one to receive it, and that he would, if he found he did not have them, have procured them had the vendor, being at home, have objected that United States notes were not tendered, and it also appeared that he afterwards notified the vendor by letter that he would be ready to pay the money whenever the vendor would receive it ; *held*, that a motion to enlarge the time for such payment ought to be granted.

United States notes may be used wherever money is to be paid, unless a different kind of money is required either expressly or by implication. Where a vendee was allowed by a decree of court the option of retaining a piece of land purchased by him, provided he pay to the vendor a certain sum for the additional number of feet it was found to contain over what it was computed to contain at the time it was purchased, *held*, that United States notes might be used as legal tender for such payment.

BILL IN EQUITY to obtain the rescission of a contract of sale of land, upon the alleged ground of mutual mistake. The proceedings in the case are so connected together that it has seemed best to report them all together as of this term, although the first two of the opinions hereafter set forth were delivered at the September Term, 1871, and the March Term, 1872, respectively, of the Supreme Court for this county. The case first came before the court at its August Term for this county, 1865, and by reference to the opinion then delivered and one subsequently delivered at the March Term for this county, 1866, reported in 8 R. I. Reports, pp. 256–273, it will be seen that the court found that in computing the purchase money to be paid by the respondent to the complainant for a lot of land purchased by the former of the latter at auction for 5¼ cents per foot, the number of feet was, by mutual mistake, assumed to be less than it really was, by about 12,000 feet, and payment therefor and conveyance thereof made accordingly, and ordered that the sale should be wholly rescinded, unless the purchaser compensate the seller in conformity with the terms of sale for the whole number of feet actually bought and

conveyed.   A decree was entered at the September Term, 1866, referring the suit to Francis B. Peckham, Jr., Esq., as master in chancery, to ascertain the number of square feet the lot contained in excess of the number it was supposed to contain at the time of the sale, and to compute the value of the excess at the rate per foot paid by the respondent at the auction sale of said lot, and to appoint a time within which the amount so ascertained by him should be paid by the said respondent to the said complainant. The decree further provided, that upon the payment thereof, within the time to be so appointed, the complainant should execute a conveyance to the respondent, the same to be approved by the master, of the number of square feet which might be so ascertained to be such excess, and that in case the respondent should fail, neglect, or refuse to pay the amount so to be computed by the master within the time to be so appointed by him, the contract of sale of said lot by the said complainant to the said respondent should be rescinded, and the respondent execute to the complainant a conveyance of the said 43,918 feet of land conveyed to him by the complainant by deed dated August 20, 1862, the said conveyance to be approved by the master, upon receiving from the complainant the amount paid by the defendant for the same, with interest, the amount so paid to be ascertained, and the interest computed, by the master.

The master reported to the court at its March Term, 1867, that he had found the aforesaid excess to be 12,710 square feet of land; that the amount due therefor, with interest, was $850.23; and that he had awarded, determined, and appointed that the said Staigg pay to the said Lawrence said sum of money on or before the 20th day of April, 1867, with interest to the day of payment.

At the September Term, 1870, of the court, this report was, on motion of the respondent, confirmed, and upon motion of the complainant the master was ordered to proceed in the execution of the decree sending the cause to him as a master, and to report his doings under the decree subsequent to the date of said report.

In accordance with said order, the master made a second report from which the following extracts are taken : —

" The undersigned, master in chancery in the above entitled cause, appointed in and by virtue of the decree of this court made

at its September Term, A. D. 1866, in addition to his report March 15, 1867, now respectfully further reports : . . . .

" That on the 29th day of April, 1867, the complainant made application to the undersigned to approve a deed to be executed by the defendant to the complainant, pursuant to the provisions of the last clause of said decree, and to ascertain the amount of money paid by the defendant to the complainant for the 43,918 square feet of land in said decree mentioned, and to compute the interest thereon as provided in said clause of said decree.

" That on May 16, 1867, at twelve o'clock, noon, at his office in Newport in said county, having duly notified the parties in said cause, . . . . the undersigned proceeded to consider said application in the presence of said complainant in person, and of James H. Parsons, Esq., the counsel of the defendant, who were both fully heard in the premises.

" That at said meeting, before any other proceedings were had, the complainant placed on the table in the office of the undersigned, American gold coin amounting to $3,051, as he then stated, and which he said he supposed would cover the whole sum which would be payable to the defendant under said last clause of said decree — the exact sum not having been then ascertained. The amount of said coin was admitted by the defendant's counsel to be as stated by the complainant, as aforesaid. The complainant then tendered said coin to the undersigned for the defendant, but the undersigned refused it, on the ground that by said decree or otherwise, he had no authority to accept it. The complainant then tendered said coin to said counsel for the defendant, who also refused it. In both cases the complainant declared the tender to be made unconditionally, and in order that complainant might be entitled to have his deed approved by the undersigned, and that he made tender to both the master and the defendant's counsel so as to avoid every question as to the sufficiency or effectiveness of the tender.

" That at said meeting, said defendant's counsel then filed with the undersigned the motion in writing herewith filed, marked C, entitled ' Motion to suspend proceedings,' which motion the undersigned overruled; whereupon said counsel filed with the undersigned, in behalf of the defendant, the following papers, all herewith filed, to wit, the paper marked D, entitled ' Protest of

the defendant;' the paper marked E, entitled 'Copy affidavit of William Gilpin;' and the paper marked F, entitled, 'Copy affidavit of R. M. Staigg.'

"That the undersigned, having heard said parties as aforesaid, and having received said documents and duly considered all the same, and having considered the evidence and allegation of the parties in the premises, thereupon then and there proceeded to grant the application of the complainant, and ascertained that the amount of money paid the complainant by the defendant for the land aforesaid was $2,308\frac{84}{100}$, and that the same was so paid August 20, 1862 ; and computed interest thereon from said day of payment to said May 16, 1867, and found the same to be $656\frac{47}{100}$, which sums added, amount to $2,965\frac{31}{100}$ ; and approved the form of a deed in the premises, . . . . and delivered said deed so approved and certified to the complainant." . . . .

The report then narrated the proceedings of the master in hearing exceptions thereto, and the appointment of a meeting for September 16, 1870, and continued as follows : —

"That the defendant then and there, in addition to the affidavits of William Gilpin and R. M. Staigg (whereof copies are herewith filed marked respectively E and F as aforesaid), which were read and accepted as evidence, called and examined as witnesses the following persons, who testified substantially as follows :

"Richard M. Staigg testified : On April 20, 1867, I applied to the master (the undersigned) at Newport, to know if I could pay to him the money ordered to be paid by me in his former report of March 15, 1867, and he replied in the negative, and said he had nothing to do with that, and would not receive the money. I have always been ready to pay said money ever since, and for some time — I don't know how long; it was left in bank at Newport, subject to the complainant's order. This is what Mr. Gilpin told me, and he also told me that he notified the complainant of it by letter. I do not know of any other communication on this subject made to the complainant.

"William B. Lawrence testified : I was not in Newport nor in this state on April 20, 1867 ; and there was no one authorized to receive said money for me — unless my solicitor of record in this cause was so authorized. I think I returned to Newport on

the 22d of April. I had intended, when I left the place, to return before the 20th of that month. I remained in Newport thirty days after the master's first report was filed, and nothing was done by the defendant under that report during that time; no deed was presented to me for execution, nor was I asked to prepare one.

"When I left Newport, I was called away by necessary business, and before my departure I asked the master if the defendant had done anything, or indicated whether he intended to do anything under said report, or had asked for any deed, or had requested the master to approve of any deed. The master answered me in the negative, and said that he had heard nothing of the defendant, and knew nothing of his intentions. I was very desirous to be in Newport in case the defendant should offer or tender money under said report, because I meant to insist on a strict tender. I heard nothing from William Gilpin until after I had applied to the master (April 26) to approve a deed for me, &c. Just after I had left the master, after making that application, I met Mr. Gilpin on the street, and he told me he had written me a note about said money; but I had not then received it. I subsequently received it, but I think it stated that the money was left with the writer, and said nothing about any bank. . . . .

"The undersigned further reports that the defendant also then and there proposed that the complainant should, if he chose to do so, examine or cross-examine said Staigg and Gilpin upon the matters contained in their said affidavit.

"And upon the foregoing, the defendant (admitting that no form of conveyance under said decree had ever previously been offered by the defendant for execution by the complainant, or for approval by the undersigned) then and there claimed that he had, in conformity with the terms of said former report of the undersigned, complied with the conditions of the decree in said causes, and was entitled to receive from the complainant a deed in conformity with said decree, and requested the undersigned to decide accordingly, and to approve the form of conveyance from the complainant to the defendant under said decree, herewith filed and marked M., O. To this the complainant objected; and the matter was then left with the undersigned, without argument or further discussion. And after full hearing, as aforesaid, hav-

ing considered the evidence and documents aforesaid, and the proofs and allegations of the parties, the undersigned refused said requests of the defendant, and decided the money last mentioned had not been legally paid or tendered (the defendant had not complied with the conditions of said decree) in conformity with said former report."

The affidavits of R. M. Staigg and William Gilpin, referred to in the master's report, were respectively as follows : —

### " AFFIDAVIT OF RICHARD M. STAIGG.

" I, Richard M. Staigg, being duly sworn, do depose and say as follows : That on the 20th day of April last, I went to Newport for the purpose of tendering the amount found to be due by the report of the master in said cause, to wit, the sum of eight hundred and fifty dollars and twenty-three cents, with interest on said sum of six hundred and seventy-seven dollars and twenty-seven cents from the 15th of March, 1867, to said 20th day of April, 1867. That I, defendant, called in company with William Gilpin, Esq., on W. P. Sheffield, Esq., the attorney of record in said suit, to make a tender of said sum to him ; that he informed me in the presence of Mr. Gilpin that he was no longer attorney for William B. Lawrence ; that I therefore called, accompanied by William Gilpin, at the residence of William B. Lawrence, Esq., the complainant ; that I was informed said Lawrence was and had for some time been absent in New York or Washington ; that I asked if there was any member of his family at home authorized to represent or act for him ; that I saw his son, Mr. Isaac Lawrence ; that a tender of the sum as before named was made by me and for me by my counsel, Mr. William Gilpin, who was present and acting for me at the time. The suggestion was made that the sum could be paid in a check if the same would be accepted, and it being intimated that that would not be perfectly satisfactory, the offer to pay, and the tender of the said amount was made, the same to be paid on the spot in ' greenbacks ; ' or United States notes of those of the national banks authorized under the act of Congress in that behalf; that the said Isaac Lawrence declined to receive the same, and stated distinctly that he was not authorized nor did he know of any person who was authorized to receive the money as ten-

dered on behalf of his father, the said W. B. Lawrence, complainant as aforesaid.

" I further state that I took all the means and made every effort that I could, or that counsel could advise me of, to make the payment provided for by the report of the master; and the absence of Mr. Lawrence, and his failure to leave any one authorized to receive the sum, alone prevented my paying the amount so provided to be paid by the said report."

## " AFFIDAVIT OF WILLIAM GILPIN.

" I, William Gilpin, counsellor at law, of Newport, R. I., being duly sworn, do depose and say as follows : That Saturday, April 20, 1867, Richard M. Staigg called at my office in Newport and requested me to accompany him to the office of Wm. P. Sheffield, Esq., in order that he (Staigg) might pay or arrange for the payment of the sum reported to be due by the master in the above entitled suit. That we called together at the office of Mr. Sheffield and informed him of our intention and wish, he being the attorney of complainant in said suit; Mr. Sheffield informed us that he was no longer counsel for Governor Lawrence in this or any other case. Mr. Staigg then accompanied me to the Aquidnick Bank, where I assisted him in getting a check for the amount due Lawrence cashed. I requested the teller of the bank to give him the money in legal tender, meaning by that ' greenbacks,' so called, United States national bank notes, and this request I believe was complied with. That thereupon Mr. Staigg and myself went together to the house of W. B. Lawrence ; we were informed by the servant that Mr. Lawrence was in Washington. We inquired if there was any member of his family at home, and were told that Mr. Isaac Lawrence was at home. We requested to see him and did see him; we asked him to inform us where his father was; he replied that he was in Washington and might return in a few days. We then told him that the purpose of our visit to his father was to pay the amount reported by the master as due from Mr. Staigg to Mr. Lawrence, and I read to him so much of the report as related to the payment of the money on or before April 20, 1867, and also the amount which the master had directed should be paid. The envelope containing the money in legal tender notes was opened

by Mr. Staigg in Mr. Isaac Lawrence's presence and my own, and the amount reported by the master was tendered then, Mr. Staigg or myself offering to count it in his presence to show that the amount was correct, and also to satisfy Mr. Isaac Lawrence that the money was all in legal tender notes. Mr. Lawrence said to us that he had received no directions from his father on the subject, and not being authorized by his father to receive the money, he declined to receive it. We then asked him if any other person was authorized to receive the money for his father, telling him that if there were any such person or persons we desired to meet with them for the purpose of paying the money to him or them. He said that he did not know of any such person, and that he did not think that there was any one in Newport who was authorized to receive the money for his father. During the interview, Mr. Isaac Lawrence asked us if we had brought specie, and he was informed by us that we had brought, for the purpose of paying the sum by us to be paid, legal tender notes ; we requested Mr. Isaac Lawrence to inform his father on his return, and as soon as he returned, of our visit, and the purpose for which we came. After some further short conversation relating partly to the lot of land in dispute in the case, and partly to other matters, and after again tendering the amount reported by the master to be due to Mr. Isaac Lawrence, which was again refused by him, we left the house."

. The case was now heard upon the respondent's exceptions to the master's report, which are sufficiently stated in the opinion of the court.

*T. A. Jenckes, Payne & Parsons,* for the respondent, in support of the exceptions.

*Bradley,* for the complainant, *contra.*

BRAYTON, C. J.    The bill in this case prayed to have rescinded a sale made at auction by the plaintiff to the defendant, at which the lot No. 1 on the plat was struck off to the defendant at $5\frac{1}{2}$ cents per square foot. The number of feet that the lot was supposed to contain (or 43,918 feet) was marked upon the plat as both parties supposed, correctly. The deed of conveyance of the lot of land was drawn and executed under this mutual mistake, and the consideration calculated upon that basis

was inserted in the deed and paid by the defendant. The lot actually contained 55,680 square feet, so that the whole consideration correctly cast would have been more than the amount paid by some $667.

Upon hearing the bill upon its merits, the court decreed that the sale should be rescinded, if necessary to correct the mistake, but that the title should not be rescinded but remain in the defendant without such rescission if he would pay the sum which the master should report due, and it was referred to a master to ascertain and compute the sum to be paid.

The decree of reference directed the master to ascertain the number of square feet in excess of that marked on the plat and the amount to be paid by defendant therefor, and having ascertained the sum, to appoint a time within which the amount so ascertained by him should be paid, and in case the defendant shall fail, neglect, or refuse to pay the amount so ascertained by the master within the time to be appointed, then the contract of sale shall be rescinded, and defendant shall execute to said complainant a conveyance to be approved by the master, of the 43,918 feet of land conveyed to him by the complainant.

The master proceeded to the execution of the decree, and on the 15th day of March, 1867, reported that he had ascertained the amount due, as directed, and had appointed the sum to be paid by the defendant on or before the 20th day of April, 1867. The report was received and confirmed, and the master directed to proceed in the further execution of his duties, and to report his proceedings. He has now reported that the defendant has not complied with the conditions of said decree, in conformity with said former report. He has reported the evidence upon which he came to the conclusion which he has reported, viz., that the defendant has not complied with the conditions.

One of the exceptions filed by the defendant to the report, and the only one perhaps that need be considered, is, that the report is not warranted by, but is against the evidence reported, and the master should have reported a full compliance by the defendant with the decree and order of the master. The question is not here whether the defendant is entitled to a release from the plaintiff, not having actually paid the full consideration, but whether he has, in the language of the decree, failed, neglected,

or refused to pay within the time appointed by the master, and that the plaintiff is entitled to a reconveyance of the estate vested in the defendant, and to a rescission of the title for failure to perform a condition. The condition is, by the decree, not made a condition precedent, for the defendant had already the title, which was to be divested upon non-performance of the condition subsequent. It is therefore in the nature of a forfeiture of his title. He was not to gain, but to save by performance.

The case has been argued as if it were to be determined by the strict legal rules of tender, and as if applied to a contract which should give a right to the party only upon performance of the thing contracted to be done by him. The act here required is not part of a contract; there is no condition, either precedent or subsequent, of a contract. [The act to be done or prescribed by a court of equity which gave the defendant the opportunity to do exact justice to the plaintiff, and if he will do so, the estate vested in him shall not be disturbed or divested.] He is to pay now the sum, which, but for the mutual mistake of the parties, would have been paid before or upon the execution of the decree. This decree the court will see fairly carried out. If the defendant shall refuse or neglect to pay, or if he shall by neglect fail to pay, he must abide the consequences of such neglect or refusal, and must reconvey. But if he has in good faith endeavored to perform on his part what is required, and has made every reasonable effort to perform, and from circumstances beyond his control failed to perform, the court would be as much bound in equity to relieve against forfeiture for such cause as to allow him to relieve himself in the first instance by payment of the unpaid purchase money.

The evidence reported by the master shows that the defendant, on the day limited for the payment, had a check upon the Aquidnick National Bank in Newport for the full amount payable; that it was presented at the bank for payment, with a request to receive it in legal tender notes; and though the packages in which the bills were put were not examined with that view, it was believed to be made up of legal tender notes. That the defendant sought for the plaintiff, or some one authorized by him, to receive the money; that the plaintiff had left the state some days before, and was not where it was possible to meet

him, or to offer him the money; that the plaintiff had left no person authorized to receive it for him; his counsel and solicitor in this case had been discharged, and the plaintiff had left no agent to act for him at his own house. His son declined to receive the money or to act for him in the matter. Nothing more could have been done had the price been gold coin. It could not have been paid. No effort, or care, or diligence, could have availed the defendant to now make the payment. Had the plaintiff left the state leaving no one to act for him in the matter, by design to avoid the payment, it is conceded that no fault could be imputed to defendant that payment was not made. But he went without any such design or intent. His business required his going, though he might have left an agent here to account to him. He did not. It did not occur, we may suppose, to the defendant that the plaintiff would be absent, and there would be no one to receive the money. The result is the same as if the departure were designed. It was an accident by which the parties failed to meet, and which rendered it impossible they should meet. The fault being, if fault there was, as much upon the part of the plaintiff as upon that of the defendant. No want of good faith is imputable to either by the other.

This is not, in our apprehension, a failure on the part of the defendant, within the fair meaning of the decree of reference. The language is, if he "shall fail, neglect, or refuse to pay," within the time, &c., to be appointed. There is no neglect or refusal. There is, to be sure, a failure to pay. But this means a failure from some fault imputable to the party. A court of equity could give no other construction to it; and had it been suggested when the decree was ordered, that any other construction would be claimed, the word fail would have been omitted. The purpose in allowing the defendant to do justice to the plaintiff would have been defeated, and will now if we hold to the strictness. Was then the defendant neglectful or refusing? We think not. He has failed because it was, under the circumstances, impossible. It may not be necessary to send this again to a master; the sum has been ascertained which the defendant is to pay, and it remains only to cast interest upon the sum from the execution of the deed.

And the court may fix by its decree the fixed time within

which the payment may be made. And to avoid such question as is now made, it will be better to direct the payment, if the plaintiff cannot be found, or any agent of his, to be made into the registry of the court, for the plaintiff; and that it be paid either in gold coin of the United States, or in notes of the United States made by statute a legal tender in payment of debt.

After the rendition of the foregoing opinion, and before the entering of any decree, a rehearing was had upon the application of the complainant, whereupon the following opinion was delivered by

DURFEE, J. In the decision formerly announced we expressed the opinion that the defendant should have further time for the payment permitted to him by the decree, inasmuch as he had endeavored to make it in good faith, though he had failed. The objection taken to this decision is that it proceeds upon a ground not now open to the court. We understand that the parties are agreed that the only question now presented for decision is, whether the defendant was, on the day appointed, ready to make or tender payment under the decree, and could, as then prepared, have made or tendered the same but for the plaintiff's absence. The testimony before the master shows that on the appointed day the defendant, with his counsel, William Gilpin, went to a bank in Newport and presented a check for the proper amount, and that the said Gilpin requested the teller to give him the money in legal tender, meaning, as he deposes, "greenbacks," so called, or United States national bank notes, and that he believes the request was complied with. With the money so received the defendant and said Gilpin went to the house of the plaintiff, then out of the state, and tendered the money to his son Isaac, who declined to receive it, not being authorized to act for his father. The said Isaac deposes that he remarked that it seemed to him that if they wished to make a valid tender it should be gold, and that Gilpin replied that bank notes were good enough for him. The defendant did not produce the affidavit of the teller who cashed his check, and therefore it may be presumed that his affidavit if given would not be favorable to the defendant. Upon this and other evidence, not materially qualifying this, the master finds that the defendant had failed to comply with the decree, and

it being conceded that the burden is upon the defendant to show a compliance, we are unable to say that the finding is incorrect, unless we are entitled to hold a readiness on the part of the defendant to pay in national bank notes was a readiness to make the payment required by the decree.

The counsel for the defendant maintains that such a readiness was sufficient, and refers to the acts of Congress approved February 25, 1863, and June 3, 1864, to show that national bank notes are money. Those acts empower certain associations, now known as national banks, to make their notes in a prescribed form, and " to issue and circulate the same as money," and provide that they shall be receivable at par in payment of certain dues to and from the United States, but do not make them receivable in payment for any other purpose. For any purpose not specified in the acts they are money only as the current notes of any bank of the state are money ; and we cannot hold that the defendant in having them was ready to comply with the decree, unless we could so hold, if, instead of national bank notes, he had had the same amount in the notes of any solvent bank of the state.

The counsel for the defendant contends that we should be authorized so to hold, and refers to certain cases in which bank notes have been held to have the character of money. Unquestionably current bank notes are, in ordinary pecuniary transactions, given and received as money ; and unquestionably, the courts, having regard to this usage or practice, are prompt to treat them as money in any matter in which they can assume that the parties have so treated or considered them. But the counsel has not referred to any case in which the court has decided that bank notes are money, or its equivalent, for purposes of payment, in the absence of anything said or done by the party to whom they were tendered as such, to prove that he had waived or that he ought to be estopped from asserting his right, to payment in specie or legal tender notes. The counsel cites the case of *Governor* v. *Carter*, 3 Hawks (N. C.), 328. In that case a sheriff sold property taken on execution for bank notes, and the court held that the sale was not a breach of official duty, he having had no notice from the parties concerned not to do so. One of the judges in his opinion said: " I do not mean to say that if the sheriff sells for bank notes without notice to sell for specie, that

*the creditor is bound to take such notes, or that the sheriff is not liable to be sued for the money ;* but it cannot be considered as a malfeasance in office, or subject him to any fine or penalty, or any action where the grievance is breach of official duty." We fail to see in this any authority for the defendant's position. In *Tutt's Adm'r* v. *Fulgham et al.* 5 How. (Miss.) 621, the court held that the return of a sheriff that he had received so much money " in bills of the Mississippi Union Bank," was not a legal, return, and said " the plaintiff is not bound by it, unless the plaintiff had agreed to receive that kind of money or notes in payment, and no such agreement appears." And in *Gwin* v. *Breedlove*, 2 How. U. S. 29, where a United States marshal received bank notes in satisfaction of an execution, the court held that he could only pay into court gold or silver, if required by the execution creditor to do so ; that he ran the risk of converting the 'notes into specie when he took them, and that having incurred the risk, he must bear the loss of depreciation.

If this is a case for the application of the rules relating to tender, we do not think the defendant was prepared to make the payment required of him by the decree, unless it may be presumed that the plaintiff waived a strict tender. But the plaintiff was absent, and therefore could neither say nor do anything to warrant such a presumption, and certainly the law must assume that every man means to exact his legal rights until he furnishes some evidence from which the contrary can be inferred. In the old case of *Lancashire* v. *Killingworth*, 2 Salk. 623, the rule is thus stated : " He that pleads a tender at the time and place and no one there to receive, must show at what time of the day he was there and how long he stayed ; *for he ought to show that he has done all that could be done on his part to accomplish what by his agreement he was bound to do.*" In *Sloan* v. *Petue*, 16 Ill. 262, the court, though it finally placed its decision on another ground, expressed the opinion that a check payable in depreciated currency was not a good tender at a place designated when the person to receive it was not present. The court said : " There are many cases which hold that a tender in bank bills which are at par is good, if the person to whom the tender is made does not object to the tender on that account. But that is upon the principle of an implied waiver of the objection, by not relying upon it. But when a party is not present, and has no

opportunity to urge the objection, he cannot be presumed to have waived it by his silence." We think this is a correct view of the law; except that we do not recall any case in which the waiver has been inferred from a simple refusal to accept the tender in the absence of any reason assigned or intimated for such refusal. We therefore cannot avoid the conclusion that the defendant was unprepared to make the payment required of him by the decree, if the payment stands upon the footing of an ordinary pecuniary claim or demand.

The counsel for the defendant contends that the payment does not stand on this footing; that the option accorded the defendant was not a debt, and that therefore it was not necessary for him to make or tender payment under it in specie or legal tender notes, but that he might make or tender it in anything which is recognized as money in ordinary business transactions. It is true the option given him is not, strictly speaking, a debt; it is a privilege of retaining the estate in controversy upon the payment of a certain sum of money to the plaintiff; but we know of no rule of law by which, without provision for that purpose, the payment for such a privilege may be made in a medium which would be insufficient for the payment of a debt. No case has been cited which recognizes such a distinction. Possibly the court might have provided for the payment in national bank notes, if it had deemed that the more equitable provision; but the court simply provided for the payment of a sum of money, and we think, to satisfy this provision, the payment must be made in money which is recognized as such by the general law of the land, independently of any waiver express or implied, and not in notes which have the character of money by mere comity or consent, or for special purposes only by statutory enactment.

We therefore think that the exceptions to the master's report must be overruled. In stating this conclusion, which differs from that which we reached on a former hearing, we wish to remark that, on this hearing, we have confined ourselves strictly to the narrow question agreed to be the question raised by the exceptions, without any regard to the wider considerations which influenced our previous determination.

After the rendition of the last foregoing opinion, the case came again before the court upon the respondent's motion for further

time within which to pay for the surplus land, and, if necessary for that purpose, for a recommitment to the master.

*T. A. Jenckes, Payne & Parsons*, for the respondent, in support of the motion.

*Bradley & Sheffield* (*Lawrence, pro se ipso*, with them), for the complainant, *contra*.

DURFEE, J.   The plaintiff sold to the defendant, by plat and at public auction, a lot of land platted as containing 43,918 feet, at five and one quarter cents per foot.   The plaintiff ascertained after conveyance that the lot contained 55,680 feet instead of 43,918 feet, and commenced this suit for a rescission of the conveyance on the ground of mistake.   The court thereupon de-· creed a rescission and reconveyance, unless the defendant should pay for the surplus land at the auction price, with interest, on or before a day to be fixed by the master to whom the cause was sent, for the purpose (*inter alia*) of ascertaining the amount so payable for the surplus.[1]   The master made report on the 15th March, 1867, that up to that date the amount so payable was $850.23, and named the 20th April, 1867, as the day on or before which payment thereof should be made, interest being left to be added thereto from the 15th March to the day of payment. On the 20th April the defendant failed to find the plaintiff, who was absent from the state, without leaving any one in the state to represent him.   The plaintiff, on his return, claimed that the defendant had failed to accept the option given him by the decree, and applied to the master for an execution of the decree in his own behalf.   On a hearing before the master on this applica-

---

[1] See, in addition to cases cited in 8 R. I. 272, *Gerrard* v. *Frankel*, 30· Beav. 485, and *Harris* v. *Pepperell*, 5 L. R. (Eq. Cas.) 1.   In *Gerrard* v. *Frankel*, there was an agreement for a lease, reserving a rent of £230.   By mistake on the part of the lessor, the lease was executed, reserving a rent of £130.   The court gave the lessee the option to rectify or annul the lease.   In *Harris* v. *Pepperell*, by mistake on the part of the grantor, a deed was executed, including land not intended to be conveyed.   The grantee was allowed the option to rectify or rescind the deed.   The bill in each of these cases was a bill to correct the mistake, but, inasmuch as the mistake was not mutual, the correction was decreed subject to an option in favor of the defendant to rescind.   The cases illustrate the power which a court of equity has in certain cases to make it optional with the defendant whether the relief prayed for or a different relief shall be administered.

tion, William Gilpin made affidavit that on the 20th April, 1867, he, acting as counsel for the defendant, went with the defendant, who had a check for the amount to be paid for the surplus land, to the Aquidnick Bank, and there requested the teller to give him the money in legal tender, " meaning by that greenbacks, so called, or United States national bank notes ; " that he believed this request was complied with ; and that with the money so received they went to the plaintiff's house, and there tendered the same to his son, Isaac Lawrence, who, disclaiming any authority to act for the plaintiff, refused to receive the same. The defendant made affidavit that the tender was made " to be paid on the spot in greenbacks, or United States notes of those of the national banks organized under the act of Congress in that behalf." Isaac Lawrence made affidavit that, at the time the offer was made, he said to the defendant and Gilpin that it seemed to him that if they wished to make a valid tender it should be in gold, and that Gilpin responded bank notes were good enough for him. No affidavit was produced from the teller who furnished the money. The master found that the defendant had not complied with the decree, and the defendant excepted to the finding. This court overruled the exceptions, being of the opinion that the master might fairly come to the conclusion, especially in view of the fact that the affidavit of the teller was not produced, that the evidence did not show whether the money which the defendant procured at the Aquidnick Bank was legal tender, that is to say, treasury notes, or simply national bank notes. The case comes before us now upon the motion of the defendant for further time within which to pay for the surplus land, and, if necessary for that purpose, for a recommitment to the master. In support of this motion the defendant has submitted several affidavits, and among them the affidavits of William Gilpin and of Charles T. Hopkins, the teller of the Aquidnick Bank. Mr. Gilpin makes affidavit that he did not intend by the language used in his previous affidavit to make a distinction between greenbacks, so called, and United States national bank notes, but that he meant to apply different names to one and the same thing ; that he distinctly remembers that he called for legal tender notes, United States notes, greenbacks, so called, and that he personally examined the package and knows that all the money tendered by

the defendant at the house of the plaintiff was in legal tender notes, and no part of it in national bank notes. Mr. Hopkins makes affidavit that some years ago the defendant came to the Aquidnick Bank and requested him or the cashier, or both of them, to furnish him, the defendant, a large amount of money in United States legal tender notes, commonly called greenbacks; that he does not recollect the amount called for or given, but does recollect that the amount furnished was given in United States legal tender notes. Other affidavits were submitted containing corroborative testimony to the same point.

We think there is little reason to doubt that if the testimony now before us had been before the master, it would have convinced him that the defendant, on the 20th April, procured the money with which to pay for the surplus land in "greenbacks," and consequently, if such money is a legal tender for such a payment, that the defendant was in no default. But the testimony was not before the master, and the defendant gives no satisfactory reason why it was not. The absence of the testimony was his own fault, and very plainly, therefore, he does not make a case for recommitting the master's report for rehearing, because of this testimony. But, though this be so, the testimony may nevertheless be used in support of the motion for further time, if that motion be grantable, inasmuch as it tends to show, not only that the defendant had provided himself with "greenbacks," but also, if it falls short of showing that, to show that the defendant intended in perfect good faith to accept the option accorded to him by paying for the surplus land in legal tender notes, and that his failure to provide himself with such money, if he did fail, was undesigned, and would unquestionably have been remedied if the plaintiff had been at home and had objected to the tender on that account.

This being the case, the question arises whether the court now has the power, and if it has, whether it ought not to allow the defendant further time to pay for the surplus land. This question has been argued with great zeal and learning on both sides. On the part of the plaintiff it is contended that to give the defendant further time to pay for the surplus land would be in effect to change the decree under which the time for such payment was originally fixed; and that any change in the decree, the

decree being final, could only be made on a petition for a rehearing or on a bill of review. Ordinarily a petition for rehearing or a bill of review is employed to correct some error of fact or of law in the making of the decree ; but in the case at bar the defendant does not seek to correct any such error, but to be allowed further time for the acceptance of a provision of the decree which is in his favor. A rehearing or review of the cause upon its merits is something which the defendant does not desire ; and certainly we can see no reason, so long as the parties are in court awaiting the execution of the decree, why a change of the decree which affects simply the manner of its execution, should not be made upon motion, if it can be made at all. The case of *Ford* v. *Wartell*, 2 Phillips, 591, bears upon this as well as upon another point in the case at bar. That was a suit for the foreclosure of a mortgage in which a decree was made for foreclosure, and after several enlargements of the time for payment, the plaintiff ultimately obtained an order absolute of foreclosure, which order was in due course enrolled. The defendant subsequently applied for a further enlargement of the time, which was allowed upon his simple motion. It appears to be a familiar practice in the English chancery courts to extend the time fixed for payment under a decree for foreclosure, and always upon motion. *Edwards* v. *Cunliffe*, 1 Madd. 287 ; *Eyre* v. *Hamon*, 2 Beav. 478 ; *Anonymous*, Barn. Ch. 221. We are therefore of the opinion that if the time can be enlarged at all, it can be enlarged upon motion, — and most properly upon motion.

The plaintiff further contends that we cannot, in any form of proceeding, give the defendant the relief for which he seeks. He contends that under the decision and decree of the court, the estate is now vested in himself, and that it cannot be divested in favor of the defendant, — the defendant by his failure to comply with the decree having incurred an irremediable forfeiture. The argument in principle goes to this extent : If the defendant on the 20th April, had supplied himself with money to pay for the surplus land in what he believed to be gold or greenbacks, and had kept it for the plaintiff until his return, and then tendered it to him, nevertheless he would utterly lose the benefit of his option if the plaintiff by critical examination could discover among the money so tendered a single counterfeit coin or bill. Now it

cannot fail to strike any fair mind, that, if such is the law, it is a dishonor to our system of equity jurisprudence. The plaintiff likens his situation to that of an owner of land who has contracted to sell it to be paid for when conveyed upon a particular day, which by the contract is made material. Unquestionably under such a contract the vendor could not be compelled to part with his land unless payment should be made or tendered at the stipulated time, from whatever accident or misfortune it might be omitted. The plaintiff is perhaps led to this view by an erroneous opinion, which is more than once expressed or implied in his argument, that his deed to the defendant, by reason of the mistake against which he asks relief, was void and wholly ineffectual to pass the title of the land which it purported to convey to the defendant, whereas at law the title passed by the deed, which even in equity is not wholly void, but voidable only by the action of the court. The privilege of paying for the surplus land was given to the defendant not in order that he might by so doing acquire a title which he had not, but that he might thereby avoid losing by a rescission of his deed the title which he already had. In our view, therefore, an executory contract for the sale of land does not afford so just an analogy as a lease with clauses of re-entry or forfeiture in case the rent is not paid by the stipulated day. Under such a lease if the rent is not duly paid, the forfeitture is relievable in equity in a proper case upon payment with interest at a later day. 1 Greenl. Cruise, tit. xii. c. 11, § 34; 2 Story Eq. Jur. §§ 1314, 1315. But a still closer analogy is to be found in the cases, to which we have already referred on another point, in which decrees for foreclosure have been made. Under such a decree a day is fixed on or before which the mortgagor is to redeem his mortgage or be foreclosed. Yet it is the practice for very slight reasons to enlarge the time. *Fleetwood* v. *Jansen,* 2 Atk. 467; *Eyre* v. *Hansen,* 2 Beav. 478; *Renvoize* v. *Cooker,* 1 Sim. & S. 364; *Quarles* v. *Knight,* 8 Price, 630; *Mowry* v. *Edwards,* 4 Russ. 125. In an *Anonymous* case in Barnardiston Ch. 221, the period was renewed three times, and in *Edwards* v. *Cunliffe,* 1 Madd. 287, four times. But it may be said a decree of foreclosure has acquired in practice a meaning which distinguishes it from the decree before us. In *Ford* v. *Wartell,* Lord Chancellor Cottenham said: " The meaning of a decree in a foreclosure suit

is merely that, in a certain event, — viz., non-payment of money within a time to. be fixed by the master, — the court will foreclose. It is the subsequent order on default of payment which creates the foreclosure." But, admitting the distinction, the practice is nevertheless evidence of a power in the court to regulate the execution of its decrees in accordance with equity and good conscience. Moreover the decree has this meaning only until an order has been passed making the foreclosure absolute; and yet there are cases in which the time for redemption has been enlarged after the passage of such an order, and even after its enrolment. *Jones* v. *Creswicke*, 9 Sim. 304, and precedents therein recited. *Ford* v. *Wartell*, 2 Phillips, 591. In the last named case virtually the same point was taken which has been taken in this case, namely, that the order absolute gave the mortgagee *an estate*, which, after the order was enrolled, could only be divested if at all in the house of lords. But the lord chancellor was of the opinion that the time might be enlarged, and accordingly enlarged it without vacating the enrolment. In the subsequent case of *Thornhill* v. *Manning*, 1 Sim. N. S. 451, Lord Cranworth, in explanation of the jurisdiction, remarked that the extension of the time was something collateral to the order making the foreclosure absolute, the order remaining the same order notwithstanding the time was extended. In one respect, these cases are stronger than the case at bar, for, but for the motion for further time, they had been, for anything that appears, completely disposed of, whereas in the case at bar the decree is still in process of execution. The plaintiff, however, contends that these cases are not in point as precedents, and cites as authority for this view the language of Lord Cranworth in *Thornhill* v. *Manning*.

In that case, Lord Cranworth, after disposing of a question touching his jurisdiction, said: " Then the question is whether, *on the merits*, I ought to make the order? (for further time.) This depends on what is the doctrine of the court in regard to mortgages. They are anomalous cases; the court in dealing with them is governed by rules which are totally different from the rules which govern it in other cases. The contract between a mortgagor and a mortgagee has been treated by this court, from time immemorial, as being something different from what it pur-

ports to be, namely, as a contract for the repayment of money for which the mortgaged estate is a pledge, which the borrower may redeem notwithstanding the day named in the proviso for redemption has long passed." His lordship then proceeds to remark that the court is strongly inclined to assist a mortgagor who applies promptly and has the means of payment, but that he must not lie by and let the mortgagee take the estate and deal with it as if he were to hold it permanently as his own. Lord Cranworth was not considering in these remarks whether the court had the power to enlarge the period of redemption, but, the power being asserted, upon what terms it should be exercised, and, in our opinion, all he means to say is, that in the case of a decree of foreclosure the court is far more liberal than in the case of other decrees. It does not follow, from the fact that a motion for further time on the part of a mortgagor, if promptly made, is favorably received, that a similar motion on the part of any other litigant will not be entertained at all, whatever claims he may have upon the consideration of the court. We think such a motion may be entertained, and consequently that the defendant's motion may be entertained, and, if supported by satisfactory reasons, granted.

The reasons in support of the motion are disclosed in the affidavits and other evidence before the court. The affidavits show that the defendant meant in good faith to accept the privilege of paying for the surplus land, and that he applied to the Aquidnick Bank for the money in legal tender notes, which, upon the testimony now before us, there is little reason to doubt he obtained; that he carried the money obtained to the plaintiff's house and found no one to receive it; that he had ample means to procure legal tender notes, and, if by any mischance he did not have them, would have procured them if the plaintiff had been at home and had objected that the tender was not made in legal tender notes; that he made a special deposit of the money which he had, and, that four days afterwards, April 24, 1867, Mr. Gilpin for the defendant wrote to the plaintiff informing him of his effort to make payment, and that the money would be paid to him when he would name time and place to receive it; that the plaintiff did not name any such time or place, but insisted (and so far as appears without regard to whether the defendant had

the money in legal tender notes or not) that he was entitled to a reconveyance of the land from the defendant. Evidently, therefore, if the payment could have been made in legal tender notes, the plaintiff's claim to a reconveyance rests upon a mere technicality, a possible miscarriage, which if it occurred did no harm, and which consequently, we think, should not be allowed to prevail against the defendant's motion.

The plaintiff, however, contends that the payment could not have been made in legal tender notes, unless by his consent, for the reason that such notes are a legal tender only for the payment of debts ; and the defendant's option is not a debt. It is true the option is not strictly speaking a debt; but nevertheless the purpose of the court in giving the option was to enable the defendant to retain his purchase upon rectifying the mistake by which the purchase was vitiated. In that view any money which would have been legal tender for the purchase, if no mistake had occurred, ought in equity to answer as legal tender for the rectification of the mistake. The purchase was after the first two legal tender acts went into effect, and, for anything that appears, when legal tender notes were available in payment. Doubtless, therefore, if our attention had been alert to the possibility of this question, when the decree was entered, we should have expressly provided for the kind of money to be used in the payment permitted to the defendant. The decree was entered without such express provision, and the question now is, whether in its absence United States treasury notes were a valid tender. In *Perry* v. *Washburn*, 20 Cal. 350, and in *Lane County* v. *Oregon*, 7 Wal. 71, it was decided that such notes are not a valid tender in payment of state taxes when the law of the state prescribes payment in gold and silver coin. Upon the authority of these cases, if the decree had prescribed payment in coin, a tender of payment in treasury notes would have been invalid. The decree, however, did not prescribe payment in coin, but left it to be made in any money which the law would sanction. The legal tender acts declare that the notes issued under them shall be " *lawful money* and a legal tender in payment of all debts public and private," &c. The acts, however, do not declare that the notes shall be a legal tender between private citizens for the payment of anything but *debts ;* and be-

cause they do not, the plaintiff contends that the notes are not available for the payment permitted to the defendant. We do not think this is a necessary inference; but on the contrary we are of the opinion that the notes, being lawful money and a legal tender in payment of debts, may be used wherever money is to be paid, unless a different kind of money is required, either expressly or by implication. Certainly this is the view which is consonant with practice in this state; for neither taxes nor fines have been exacted in coin. We have a statute which authorizes a tender of pecuniary amends in cases of tort (Gen. St. ch. 501, § 10). It would be singular if a tender of United States treasury notes would be nugatory in such a case, when the same kind of money would be entirely lawful in satisfaction of a judgment recovered against the party making the tender. We think it the more reasonable view that the same money which would satisfy the judgment might lawfully be tendered in amends for the tort. The plaintiff objects that it is in violation of the Constitution of the United States for a state, and *a fortiori* for any court in a state, to make anything but gold and silver coin a legal tender. The Constitution simply declares that no state shall " make anything but gold and silver coin a legal tender in payment of *debts.*" The option permitted the defendant is confessedly not a debt; if it were a debt, the question now under discussion would not arise.

We therefore think that the fact that the defendant did not purpose to make his payment in gold and silver, and consequently did not prepare himself so to make it, is not a reason for refusing to grant the defendant's motion.

We grant the motion, but, inasmuch as the expense of the litigation since the decree is largely attributable to the carelessness of the defendant, we shall charge him with the payment of costs in this suit. *Decree accordingly.*